## THE ATLAS NO. 5.

(District Court, S. D. New York. July 13, 1920.)

1. **Towage** ⊜⟶11(10)—**Tug responsible for care of tow while awaiting completion of towage.**
   A tug which divides a towage service into two parts, though for the convenience of all parties, is not relieved of responsibility for care of the tow while laid up awaiting completion of the towage.

2. **Collision** ⊜⟶68—**Duty of tug removing one of connected barges to see that others are safely secured.**
   It is the duty of a tug on removing a barge to which others are moored to see that such others are safely secured before she proceeds so that no damage will be done.

3. **Collision** ⊜⟶68—**Tug liable for collision of barges cast loose.**
   A tug, which took out an inner one of a number of barges moored together and to each other, *held* liable for a collision between barges cast loose and others against which they were drifted by the tide.

In Admiralty. Suit for collision by Walker D. Hines, Director General of Railroads, operating the New York, Ontario & Western Railway, against the Cornell Steamboat Company and the barge Atlas No. 5. Decree for libelant against the Steamboat Company.

Decree affirmed 272 Fed. 175.

LEARNED HAND, District Judge. I think in this case the first question is as to what actually happened. The situation was one quite common in the harbor and of daily occurrence at the exact place in question. Between Piers 52 and 54 on the Manhattan shore of the North River is a place called the "market," at which a statute of the state of New York permits barges to be moored, and every day these

slips are full of barges left there by the Cornell Steamboat Company, the respondent in this case. On the day in question the slips may fairly be said to have been packed with barges of one sort or another. I accept the drawing (Exhibit 1) as a correct statement of the way the barges lay, for it is uncontradicted.

It appears that on the south side of Pier 54 lay some eight barges pointing across the stream and coming out nearly to the end of the pier. Pier 53 was then in process of completion, and did not come out as far as Piers 52 and 54, consequently there were some six barges, which lay off the end of this new pier, and were pointed up and down the stream. The middle barge of the outside tier of these barges was a coal boat of the Cornell Company. The night before the usual Cornell

tow had come down the river with a number of barges made up in the customary way. Some of these had been delivered to their destination, but there remained at least seven which had been tailed on to a spile on the south side of Pier 54. These lay as follows: Next to the pier was the W. J. Wilson inside, and outside the James Williamson. Back of the W. J. Wilson was another scow, called the Williamson, and back of the Williamson lay the O-W No. 21, the injured barge. The barge Atlas was moored to the Wilson by one line and by another line to the Cornell coal boat. Back of the Atlas lay the Mulford, which was moored to the Atlas and also to the barge lying just inside. Outside the Atlas and the Mulford lay the Garfield. As these boats lay, they were safe from the changes of the tide and did not swing. Apparently the whole flotilla may have been made fast to the new dock, but the exact disposition of the lines does not appear. It is sufficient to say that they lay bunched there together. On the morning of the 21st of September a tug came in to drill out the Cornell coal boat. To do so it was obviously necessary to get inside the Atlas, the Mulford, and the Garfield. I am satisfied that the tug which did this was one of the Cornell tugs; indeed, there is no evidence to the contrary—perhaps there could not be, under the circumstances. Whether it was the Welsh, the tug which the libelant says, or some other Cornell tug, I am not certain, although my belief is that it was the Welsh. But that it was a Cornell tug I accept.

At the time in question the tide was flood, and what happened was this: The tug directed the barges to throw off their lines (that is to say, the Mulford and the Atlas), so that it could get in between them and take out the Cornell coal boat. In doing so, it must have been obvious to every one that these three barges would fall down with the flood tide against the four barges which were swinging off the end of Pier 54. Further than this, it necessarily follows that, as the tug went in between the Atlas and the Cornell boat, she must shove out into the river the three barges so disconnected. In some way not wholly disclosed, but sufficiently clear to admit of a finding, these three barges came down on the flood against the Wilson and the O-W 21. They appear to have done no damage to the sterns of either of these barges, but the bows, which were pointed upstream, necessarily came in contact with the Williamson and the W. J. Wilson, and something struck the two forward planks on the rake of the O-W 21 with sufficient violence to break or crack them. This resulted in springing a leak on board the O-W 21, from which in about half an hour she sank. The tug Welsh endeavored to save her by towing her across the river, but had not sufficient time, so that she sank some 300 feet off the Jersey shore, before she could be beached. It does not appear whether the O-W 21 had any fenders or not.

[1] The question arises as to who shall bear this loss. Unfortunately, it is much more substantial than the occasion would have rendered probable. I must agree with Mr. Erskine that the circumstances hardly made it probable that what the tug did should result in sinking one of the barges, but it does not seem to me that it was wholly be-

yond those expectations which a careful and prudent tug master was bound to have in mind. First, I may say that I regard the barge, O-W 21, as being still in charge of the respondent. It is agreed that the contract was to tow this barge from Cornwall-on-the-Hudson to Stapleton, and I do not agree that by dividing up the transit into two parts, the tug relieved herself of any responsibility. I do not, of course, suggest that it was improper to divide the transit into two parts. As a practical thing it was the way to proceed for the convenience and economy of all concerned, but I cannot regard the respondent as being discharged of responsibility during the period when the barge lay moored at the "market." That being so, it seems to me quite clear that the tug owed to the barge a duty, and the usual duty, of reasonable care under the circumstances.

[2, 3] Now the custom appears to be, when a tug drills out an inner barge in this way and throws off the lines, or requires the bargees to throw off the lines, either to see to it that the barges are properly moored or at least to give adequate time to the bargees to secure themselves by new lines. Whether the custom were so or not, I should hold that the tug's responsibility was such. I think that the tug is bound, having disturbed the mooring at the time, to see to it before she proceeds, that the barges are again secured, so that no damage shall arise. It is suggested here, however, that the situation was such as not to suggest that any damage could arise. I have already considered that question. I agree that the damage was somewhat improbable, but it does not appear to me to be so out of the ordinary run of things as to be beyond what is fairly chargeable to a tug, and for this reason; this, as I have said, was a case in which there was a substantial flood current. These three barges, thrown loose as they were, would therefore acquire a momentum upstream. As they came in contact with the two other barges, their speed would probably be somewhat changed; but the weight of the whole moving flotilla would be increased by those two barges, and I cannot say that to allow five barges to come up against the two that remained on the end of Pier 54 was not an act from which it might be supposed that some of the planks would be cracked. Nor does it seem to me to follow that if the O-W 21 had had out fenders this would necessarily have been prevented. The fenders, of course, did not go below the water line, and the crack was below the water line.

It is suggested that the fenders would have kept the barge off. Perhaps they might, but the weight of five barges might also well have broken the fenders. We know that the planks were broken; we are reasonably certain that they were broken in the way in question. The burden rests upon the tug to establish the fault of the O-W 21, if it were at fault, not to have fenders out, and the record does not bear any evidence on this question. I cannot say that the mere fact of damage is proof that there were no fenders out, because I know too little of just how the planks were broken. There seems to be no case on the subject, which is very close. The nearest is one that Mr. Martin has referred me to, a decision of Judge Thomas in The Guy G. Major (D.

C.) 124 Fed. 95. In that case a steam lighter, being discharged and wishing to leave her place, threw off the lines of the barge which lay outside of her, and the barge, being adrift on the flood tide, came in contact with a boat further upstream and damaged her. The lighter was held responsible, and the barge excused, because of the questionable proof that the bargee had failed to do with his lines what he ought to have done. Now that case was a weaker case than this, because the steam lighter had no duty to the barge, not being her tug, and yet to throw off her lines under the circumstances was held to be a negligent act.

It may be suggested here that the tug did not throw off the lines, and probably this is true. Either the Cornell coal boat threw off the lines of the Atlas, or the Atlas threw off her own lines. The bargee on the Atlas says that the first was the case. But I think it makes no difference whether the tug threw off the lines or directed the bargee to do so, for the tug in this case had the directing control, and told the bargee to throw off the lines. It took the responsibility for doing so, and the bargee was under the circumstances bound to obey, at least between the tug and the barge. The responsibility must rest upon him who initiated the movement, and so upon the whole case it seems to me that the tug must be held at fault and the barge must be held not at fault. I also find that the O-W 21 is not shown to have been at fault in failing to have out its fenders.

The libelant must have the usual decree.