### THE VENUS.

### THE EMPIRE NO. 5.

### NEW YORK TRAP ROCK CORPORATION v. CORNELL STEAMBOAT CO.

District Court, S. D. New York.
Feb. 28, 1934.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for respondent.

GODDARD, District Judge.

This action was brought by the libelant, the New York Trap Rock Corporation, as charterer of the two deck scows Venus and the Empire No. 5, to recover damages sustained as a result of the scows breaking from their moorings at a dock at Rockland Lake Landing on the early morning of October 13, 1927, going adrift and fetching up against some ice breakers located nearby. The scows were each about 100 feet long and 40 feet wide and were light.

The respondent, the Cornell Steamboat Company, had been engaged by the libelant to tow the scows which were then lying at Tarrytown to Tompkins Cove and Verplancks Point some miles up the river. The libelant was aware that respondent frequently, in making up its tows, moored the scows temporarily at the dock of Rockland Lake Landing while a full tow was being gotten together. This dock is one that was formerly used by the New York Trap Rock Corporation when it was carrying on operations but had not been used for several years by it and was somewhat out of repair.

On the afternoon of October 12, 1927, the scows Venus and the Empire No. 5 were moved over by the respondent's shifting tug Mould from Tarrytown on the east side of the river to Rockland Lake Landing to remain there to await the arrival of the up-river tug and the rest of the tow. The Mould, with the Venus and the Empire No. 5, reached Rockland Lake Landing at 5:45 p. m. The light brick scow, Charlotte, was lying moored to the upper or northern end of the dock; another brick scow which was loaded was moored to the south end of the Charlotte, and an iron boat was made fast to the south end of the brick scow. The Mould hung up the Venus and the Empire No. 5 outside the Charlotte, the Venus being next to the Charlotte. The Charlotte had been made fast at her upper and lower ends by lines around mooring posts on the dock which led back to cleats on the Charlotte. There is no proof of any inspection of the Charlotte's lines by any one on the Mould, except one of her deck hands testified that "so far as he could see they were in good condition." After the scows were tied up the Mould left for Haverstraw for the night, which is 3 or 4 miles above Rockland Lake Landing.

From the records of the United States Weather Bureau at New York City, and from the testimony of Mr. Scarr, an official of that Bureau, it appears that on the morning of the 12th storm warnings were hoisted and many of the companies engaged in shipping in the vicinity of New York were warned by telephone, including the respondent, although it does not appear that the respondent communicated with its Haverstraw office to which the tug Mould was attached. During the forenoon, the barometer began to drop and continued to do so throughout the day. The wind gradually increased from 35 miles an hour to 48 miles from the south. During the afternoon to upwards of 40 miles an hour, and between 6 and 7 p. m. the wind

shifted to the southeast and reached the velocity of 50 miles an hour, and steadily increased until around 1 o'clock in the morning when it reached the average force of 64 miles an hour and the maximum of 70. Mr. Scarr testified that the storm originated in the vicinity of Lake Superior and moved in this direction and that the wind velocities in the vicinity of Rockland Lake Landing would be about the same as in New York City, and from his testimony and the testimony of others who were in the vicinity of Rockland Lake Landing, I am convinced that the weather conditions there and in New York City were practically the same. The dock at Rockland Lake Landing on the west side of the river is exposed in a southeasterly storm and the wind caused a rough choppy sea in the vicinity of the dock. High tide in this locality was 11:33 p. m.

Between midnight and 1 a. m. the lines of the lower or southerly end of the Charlotte parted and the three scows then swung around up-stream. Shortly thereafter these lines slipped off the mooring post on the dock and the three scows were carried up against a supply boat which lay 50 to 60 feet above the landing. As they came alongside the supply boat, the captain of the Venus boarded the supply boat and put a line around a cleat on the supply boat, but while one end of this line was being made fast on the Venus the cleat on the supply boat broke off and the three boats went adrift again and finally fetched up on some ice breakers two or three hundred feet away. The Venus and the Empire No. 5 pounded against the ice breakers and received some damage before they were brought back and again made fast to the dock at Rockland Lake Landing in the morning.

There is some testimony that the mooring post around which the northerly lines of the Charlotte had been placed broke off when her lower lines parted and the three scows swung around, subjecting the mooring post to the added strain, but the testimony is overwhelming to the effect that the post did not break. In view of the fact that the post did not break and that the line was found intact the following morning with both ends fast to the Charlotte, it seems to me that the only rational conclusion is that the line slipped over the top of the post, for at high tide the deck of the Charlotte and the top of the post would have been just about on a level, and with the pitching and tossing of the scows it would be natural and likely to slip off.

The libelant makes several charges of fault against the respondent including those of mooring the scows where they were exposed to dangerous winds, and of its failure to inspect the lines of the Charlotte and to see that they were sufficient to meet weather conditions reasonably to be anticipated.

The respondent was not an insurer of the scows, but it was charged with the duty of exercising reasonable care while they were in its custody. The mere fact that the tow was in good order when received by the tug and in damaged condition when redelivered by it does not raise the presumption of negligence against the tug. Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699. This duty continued when it tied up the scows at Rockland Lake Landing, while they were waiting there, and until the towage was completed. Doherty v. Pennsylvania R. R. Co., 269 F. 959 (C. C. A. 2); The Atlas No. 5 (D. C.) 272 F. 171, affirmed 272 F. 175 (C. C. A. 2).

The question to be determined in the case at bar is, as I see it—what was the proximate cause of the scows going adrift—for it was their going adrift that resulted in their damage. It is not, it seems to me, a question of scows being swamped or pounded in a berth which was unsafe "pro se" in heavy weather. If the berth had been unsafe, the other scows in an equally exposed condition would have been affected also but they were not; neither was the Venus nor the Empire No. 5 damaged until they went adrift. The respondent had been using this dock for several years to hang up scows and barges while getting together a full tow for a trip up the river. The damages resulted not from the place where they were moored but from their moorings giving way and their going adrift, and the question is, Who is responsible for the failure to see to it that they were properly moored to meet the conditions?

It is the duty of a tug master, who adds his tow to a moored flotilla, to inspect the lines with reference to their ability to bear the added weight under conditions of tide and weather which are to be anticipated. Cleary Bros. v. Port Reading R. Co. (C. C. A.) 29 F.(2d) 495. Even if the master of the Mould did not know that storm warnings had been sent out by the United States Weather Bureau, it seems to me that the steadily increasing winds and the rapid falling of the barometer and other conditions were such as to warn a competent and experienced tug master that a severe storm was on its way and that extra precautions should be taken by him to protect those scows in the exposed position in which he had placed them;

and particularly to see that the fasts of the Charlotte were sufficient.

Judge Campbell said in The Mary Ethel (D. C.) 290 F. 458, at page 461, where a tug made fast a barge outside of another moored to the dock:

"The master of the Mahanoy (tug) owed a duty to the Thomas Bulger (barge) when he made her fast outside the Dutch Boy (moored tug) to see that the lines between the inside boats were sufficient and proper to hold her in the berth he selected, and, if in doubt, to have made her fast by proper lines to the bulkhead. * * * "

It was also the duty of the tug to see that the Charlotte was made fast in such a manner that with the rising tide and high winds her lines would not slip over the top of the mooring post, and Judge Ward in The Ganoga (C. C. A.) 257 F. 720, at page 721, in which a tug was held liable where a tow which she had moored broke loose, said:

"The negligence, if any, was in the failure to foresee that the Bessie, tossing and surging in such wind and weather, with her deck higher than the top of the pile, would be likely on the rising tide to slip the line over the pile. Under these circumstances we think ordinary care required that a better fast than the usual slip fast should have been made, and that the tug was at fault for not seeing to it, whereas boatmen could not be held at fault for want of such nautical skill."

So in the case at bar the tug master should have foreseen that at high tide, which would occur at a little before midnight, the deck of the Charlotte would be on the level with the top of the mooring posts and with the rough water causing her to toss and surge the line was likely to slip over the top of the post, as it did. While the southerly line of the Charlotte to the dock may have been and probably was sufficient to hold her, when the tug master added the strain of two large scows in a threatened gale, he should have been careful to see that the existing line was sufficient to stand it and, if not, to put out other lines. He failed to do either of these and the line broke.

There are certain obligations upon the part of barge masters, but under the circumstances here I do not think the masters of the Venus or the Empire No. 5 can be responsible for the conditions. Their own lines held. Their scows were brought in when it was getting dark; they had not been there long enough to be chargeable with notice of the conditions. It does not appear that at midnight or a little after when the southerly line of the Charlotte parted and the three scows swung around, they could have gotten ashore to do so or had the opportunity of putting out other lines in time to save them from going adrift.

Moreover, "In determining the duty of the captain of a barge, we must remember that he is not a navigator, but only a deck hand and keeper of the barge, and not hold him responsible for the performance of a duty which the master of a tug boat, due to his superior knowledge as a seaman, should have known to be necessary." The Mary Ethel (D. C.) 290 F. 458, page 461.

I think that the master of the Mould was negligent in leaving the Venus and the Empire No. 5 as he did under the circumstances and that his failure to use reasonable care in mooring them was the proximate cause of their going adrift and being damaged. Such a conclusion is in accord with The Mary Ethel, supra; Pennsylvania R. R. Co. v. James McWilliams Towing Line, 277 F. 798 (C. C. A. 2); O'Boyle v. Cornell Steamboat Co., 298 F. 95 (C. C. A. 2); Rice v. Erie R. R. Co. (D. C.) 272 F. 130; The Ganoga, supra; Doherty v. Pennsylvania R. R. Co., supra.

Libelant may have a decree with the usual reference as to damages.