## THE BLACK DIAMOND NO. 2.

### THE PERTH AMBOY NO. 2.

#### No. A–17001.

District Court, E. D. New York.

Dec. 7, 1944.

Solomon Goodman, of New York City, for libelant.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for respondents.

KENNEDY, District Judge.

In this case the libellant's suit is for damage done to the barge Black Diamond No. 2 on November 22, 1943.

On November 21, 1943, at two o'clock in the morning the Black Diamond No. 2 was placed outside of three other barges at the light stakes at Perth Amboy, south of the dumper coal dock, with her stern toward the dumper dock and her port side toward Arthur Kill. A tier of barges lay ahead of her and a tier of two boats lay

astern of the two innermost barges of the tier in which she was.

On the next day, November 22, 1943, about 1:30 p. m. the tug Perth Amboy No. 2 approached the light stakes for the purpose of towing out the barge on the starboard side of the Black Diamond No. 2. At this point the Perth Amboy No. 2 collided with the after portion of the Black Diamond No. 2, scraped along the port side of the barge, and started two end planks. The damage began at a point eight inches below the deck. One of the planks was started approximately an inch and a quarter, and the lower part of that plank was crushed slightly above the water line at the port corner of the barge. The side planks were abraded. Otherwise the barge was in good condition when she was surveyed. About three weeks before the collision the barge had been in drydock where her bottom was searched and caulked. Although she was quite an old boat the seams appeared to be tight and the caulking in good condition even at the point where the damage occurred.

There can be no question that the Perth Amboy No. 2 collided violently with the barge, and that the Perth Amboy No. 2 was at fault.

During his direct examination the master of the tug Perth Amboy No. 2 was asked whether he had struck the corner of the barge. His answer was very informative. He replied, "No sir—not with the tug". Asked whether he had struck the barge with anything else, he said, "Not to my recollection—no". If these answers be read in the light of the other testimony in the case it becomes clear that the collision occurred substantially in the manner described by the bargee, the libellant here. It is urged on behalf of the tug that the bargee was mistaken concerning the state of the tide, and he was. But he mentioned the tide merely by way of explaining how the tug came into collision with his barge, and his error in this respect does not in any way weaken the factual background indicating that the tug was at fault.

On the day after the collision, November 23rd, the barge was moved into the dumper slip at Perth Amboy. She has a capacity of one thousand tons, but only five hundred and ten tons were put on board. She was then towed out from the dumper and put into a slip a few hundred feet away. The loading had commenced about 5:30 on the evening of November 23rd and apparently was completed at about 6:30 p. m. Shortly after that the bargee discovered that the Black Diamond No. 2 had made thirty-two inches of water. Using a centrifugal pump he worked from seven o'clock in the evening of the 23rd until five o'clock in the morning of the 24th, at which time he was compelled to ask for assistance from a tug nearby. This tug moved the barge to the back of the dumper, where she sank. The coal was then removed, and the barge raised and taken to Castagliola's Dry Dock, Greenpoint, Brooklyn, where she was surveyed on December 23rd.

Describing the collision, the bargee said that after he had received what he described as a hard knock he called over to the master of the tug and asked if any damage had been done to his barge and received a reply in the negative. He made no inspection himself. It is true that the damage to the end plank could not be seen from the inside of the barge. The bargee is an old man and it is probably true that it would have been difficult for him to inspect the stern and the port side of the barge while she was at the light stakes. I make every allowance for the fact that the damage was more easily visible from the deck of the tug, that barge captains are difficult to discipline and that they are not navigators, but merely deck hands and keepers. The Mary Ethel, D.C., 290 F. 458; The Venus, D.C., 6 F.Supp. 950, 1934, A.M.C. 397. But from the time of the collision until the barge began to leak after she was loaded late in the evening of the following day the barge captain made no effort to inform himself of the extent of the damage. I do not believe his failure to inspect was caused or excused by anything that was said to him by the master of the tug.

I am persuaded that by any standard it was the duty of the barge captain to make an inspection or to procure one to be made, that the tug had the right to suppose that an examination would be made, and that failure on the part of the barge captain to investigate was the proximate cause of the sinking, and the damage that flowed from it. The Mars, D.C., 9 F.2d 183.

Libellant is entitled to a decree against claimant and respondents for the damage sustained by his barge as a result of the collision only.

Submit findings of fact and conclusions of law in accordance with this opinion.