**Petition of TRACY et al.**

**THE MARY T. TRACY.**

**RED STAR TOWING & TRANSP. CO. et al. v. PENNSYLVANIA R. CO. et al.**

**LONG ISLAND LIGHTING CO. v. PENNSYLVANIA R. CO.**

United States District Court
S. D. New York.
May 17, 1950.

Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan, New York City, of counsel), for petitioner.

Foley & Martin, New York City (Christopher E. Heckman and William J. O'Brien, New York City, of counsel), for Red Star Towing & Transp. Co.

Hill, Rivkins & Middleton, New York City (Thomas H. Middleton, New York City, of counsel), for damage-claimants.

Burlingham, Veeder Clark & Hupper, New York City (Adrian J. O'Kane and Benjamin E. Haller, New York City, of counsel), for claimant-respondent, Pennsylvania R. Co.

Frank G. Colgan, Brooklyn, for damage-claimant, Berwind-White Coal Mining Co.

LEIBELL, District Judge.

The limitation and exoneration proceeding (A 144-151) was instituted in this Southern District by the owners and charterers of the tug Mary T. Tracy. Two actions were brought by damage claimants: one in this Southern District (A142-72) by the Long Island Lighting Company, as owner of the cargo of coal aboard the coal barge Red Star No. 50, against the Tracy Towing Line, Inc., the Pennsylvania Railroad Company and the tugs Mary T. Tracy and the Baltimore; and the other in the Eastern District (later removed to this Southern District) (A 163-155) by the Red Star Towing and Transportation Company, as owner of the coal barge Red Star No. 50, and by Henry Devanny, the barge captain and the captain's wife, Edna Devanny, against the Pennsylvania Railroad Company and the tug Baltimore and against the Tracy Towing Line, Inc. and the tug Mary T. Tracy. The two actions and the limitation proceeding were consolidated for trial.

In the limitation proceeding the Berwind-White Coal Mining Company, as owner of the coal barge Eureka No. 29 filed a claim for damage to the barge; the Thermal Fuel Corporation, as owner of the cargo of coal on the coal boat Jackson, filed a claim for the loss of the cargo; and Thomas J. Howard, as the owner of the coal boat Jackson, filed a claim for the loss of the Jackson. The total of the claims of the libelants and the damage claimants is about 2½ times the value of the tug Mary T. Tracy.

The evidence at the trial established that the flotilla of seven barges broke loose from the bulkhead at 34th Street and the East River because of the extra strain which the addition of the Jackson to the tier of six boats put upon the lines of the inmost barge, the Eureka No. 29, causing the lines to part. The master of the Mary T. Tracy was negligent in not directing the deckhand of the tug to examine the lines by which the Eureka No. 29 was moored to the bulkhead. The deckhand of the Mary T. Tracy did not go beyond the coal barge Cape Kelly, the fourth barge out from the bulkhead. If he looked at the lines of the Eureka No. 29, which were black from use, it was from a point about 70 or 80 feet off. He could not properly examine the lines from that distance, even though there were flood lights on the wharf for the unloading of the Eureka No. 29. The deckhand of the tug Mary T. Tracy was negligent in his examination of the lines.

It must have been apparent to the captain of the tug Mary T. Tracy and to the deckhand, that all the barges in the tier were fully loaded, except the Eureka No. 29 which was being unloaded. When a barge is tied up to a wharf the barge is not required to put out enough lines to hold securely any other barges which may later tie up to his barge. The No. 225, D.C., 272 F. 130. It is the duty of the tug captain, who ties up a barge to barges already moored, to make sure that the lines to the wharf are secure and sufficient to hold the full

tier of barges with his barge added, and to make sure that the lines connecting the various barges in the tier are sufficient to hold the respective barges in their place in the tier, so that none of the barges will break loose due to the additional strain of the barge he is adding to the tier. Pennsylvania R. Co. v. McWilliams Towing Line, 2 Cir., 277 F. 798; The Venus, D.C., 6 F.Supp. 950; Clearly Bros. v. Port Reading R. Co., 2 Cir., 29 F.2d 495; The Bartle Daly, 2 Cir., 45 F.2d 605.

The owners of the tug Mary T. Tracy argue that the lines of the Eureka No. 29 (Exs. 1, 2, 3, 4 and 5) and the photographs thereof (Exs. 1A, 2A, 3A, 4A and 5A) show that certain of the Eureka's lines were cut with a sharp instrument, and that the lines did not part under the extra strain of the barge Jackson and its cargo of coal. The evidence does not prove that the lines were cut and the probabilities are strongly against any such inference. Five sections of line were produced in Court at the trial; two short pieces alleged to have been found on a horned cleat on the bulkhead near 34th Street on the morning of January 23d, 1946, and three long pieces of line found on the Eureka No. 29 after she was towed back from the 96th Street rack to the 34th Street bulkhead. Captain DeMars, an expert called by the damage claimants, testified that the appearance of the lines indicated that they had parted under strain. The expert produced by the owners of the Tracy was of the opinion that in several places the lines appeared to have been cut. Counsel for the Tracy contends that the lines of the Eureka No. 29 were cut at the steel horned cleat on the bulkhead. The position of the cleat on the concrete bulkhead, lodged between the ends of two heavy timber stringers (see photos, Exs. RS 6 and 6A), was such that a person who wanted to sabotage the tier of barges by cutting the shore end of some of the lines would have to stand in a very awkward position to swing an ax at the lines. If a line was taut, he ran the risk of being struck by the line as it whirled loose when cut. Further, the strain on the line would prevent him from cutting the one line in two places before the line pulled loose. Yet that, in effect, is the untenable contention of petitioner's counsel—that each of the two small pieces of line (Exs. 1 and 2) found on the wharf cleat, was cut out of a Eureka line running around the wharf cleat. Both ends of the Eureka lines were attached to cleats on the barge.

There were flood lights on the bulkhead to enable those engaged in the unloading operation to do their work at night. The captain of the barge Eureka No. 29 went home about 5 P. M. The unloading operation on the Eureka No. 29 started between 5 and 6 P. M. and was still in progress when the tier of barges broke loose about 10:15 P. M. During the unloading operation there were present the crane operator, who operated a bucket crane attached to a tractor, the drivers of the coal trucks, usually three in number, and the coal trimmer on the barge. The coal trimmer was not in any position to see what happened ashore; the crane operator and the truck drivers were.

The crane operator, Mr. Hazel, was a witness at the trial. The crane had a clam-shaped bucket which could hold half a ton. He described how the crane was operated, under portable acetelene lights. He saw no one at the lines of the Eureka No. 29. The down stream lines from the bow end of the Eureka No. 29 were the first to part. Then the tier swung around with the flood upstream tide. Next the upstream lines from the stern end of the Eureka No. 29 parted. The lines of the Eureka No. 29 parted shortly after the barge Jackson was tied up to the tier. The crane operator tried to hold the Eureka with the aid of the crane bucket. The coal trimmer got a line and threw it to the bulkhead, but that line also parted. The coal trimmer was still aboard the Eureka No. 29 as the tier of barges drifted out and upstream.

The crane operator hurried by truck to a dock at 47th Street and tried to help the flotilla but was unsuccessful. The coal trimmer managed to get ashore when the tier drifted towards the docks at 47th and 48th Streets. The crane operator and the boat trimmer testified concerning their efforts to save their barge. All that they did completely refutes any suggestion that

either they or any of the truck drivers could have been involved in any act of sabotage. And it is hardly likely that any stranger would have run the risk of sure detection, if he had attempted to cut the lines of the Eureka while she was being unloaded. The probabilities are a safe guide. The Black Diamond, 2 Cir., 273 F. 811.

I have considered also the possibility that the crane bucket cut the lines. The testimony of the Tracy expert (Mr. Hatch) was that the lines had been cut by a sharp instrument. He could not say if a clam shell bucket could do that. The crane bucket's edge was about an inch thick. The cutting is alleged to have been done with a sharp instrument near the cleat on the bulkhead. The cleat was so protected by the wooden stringers at each end of the horn that it would be difficult for the crane bucket to strike the lines on the cleat. It is not at all likely that the bucket could have struck the lines at the edge of the concrete bulkhead with sufficient force and in such a manner as to cut each of the two lines in two places, four cuts in all. The crane operator testified that he did not hit the lines with the bucket. Two barge captains testified that the lines parted with a report, such as is heard when lines break under a strain. The Tracy's contention that the lines of the Eureka were cut is contrary to weight of the credible evidence and contrary to the physical facts themselves. The Tracy Towing Line, Inc.'s petition for exoneration from liability is accordingly denied.

As to the issues raised by the petition for limitation of liablility, and the answers thereto, I have concluded that the petition should be granted. The damage claimants argue that the record of the trial shows (1) a continuous practice on the part of Davis, the mate in charge of the tug Mary T. Tracy, of omitting to examine the shore moorings of barges at bulkheads to which he moored additional vessels, and (2) that the alleged negligent practice of the pilot was within the privity and knowledge of Collins and others, who managed the business of the charterers. Tracy Towing Line, Inc.

Davis had worked on vessels since 1932 and had been on tugs in New York Harbor about seven years. He had been employed by the Tracy Towing Line since May 1942 and held a license since June 1943. His deckhands were Cowin and Morrison, very good deckhands. The tug Mary T. Tracy was in excellent condition.

Davis described his practice in landing a barge in the vicinity of 34th Street, when there is no room at the bulkhead, as follows: he would "take the shortest tier or what looks to be the safest spot to land it up, if there is no other dock in the vicinity" and tie it up to the tier that he thought would be the safest—and "try not to hang a loaded boat in a light tier and pick out a tier that looks like it is secured safely", one "that has the lines out that look the best". In order to find out which tier was the best, Davis would send a deckhand over to see what the lines looked like, to see if they would hold the weight of the boat. The deckhand would come back and describe the lines, and if he said he did not think it is safe, then Davis would either look at the line himself or go somewhere else. The deckhand reported how many lines were out, what size they were, whether they were new lines or worn, or had a cut. He did not do that all the time but the majority of the times. If the tier of barges looked as if it had a lot of strain on it, Davis would send a man over to investigate. From the pilot house he usually could see the lines on the tier. He had a search light. If he saw a line that looked like a small line, he would send a man to see how many lines the boat had out and their size. He relied principally on the deckhand's judgment. He could not go over and examine the lines himself. The deckhand would give the lines a quick glance as he walked past the lines. He would go as far into the tier as the man in the pilot house told him to go. Most of the time the pilot can see all the lines from the pilot house. If four boats are in a tier, an examination of each boat at both ends would take about 15 minutes. In January 1946, they were busy. It was the aftermath of the war and they had to keep going as fast as they could. As to his instructions concerning his duties aboard his tug, Davis

said: "You get those when you get your license—it is in the examination and you learn how to tie up boats when you are a deckhand before you get your license. While serving as a deckhand you work under licensed masters." No one in the Tracy office gave him any instructions as to his duties—neither Mr. Collins nor Mr. Richards nor Mr. Clemente.

Cowin, the deckhand, testified that he had been a deckhand on the Mary T. Tracy for eight years up to January 1946. He was never told to go and examine every line on all the inside boats. It might take an hour. To examine the lines on three boats would take 20 or 25 minutes. From a distance of four or five boats away he could not see a line in the inside barge even with a tug's search light on it at night. Mr. Collins who hired him gave him no instructions as to his duties, but the tug captain did.

Mr. Collins occasionally rode the tugs but his principal work was that of a dispatcher. He was not a licensed man. A Mr. Lucas, an engineer employed by Tracy Towing Line, Inc., made regular trips on the Tracy tugs. He was licensed as an engineer and made the trips for the purpose of seeing that the Tracy tugs were properly maintained. It has been affirmatively shown by the petitioners that the alleged "continued practice of negligence" on the part of Captain Davis and the crew of the tug Mary T. Tracy (assuming that there was any continued practice of negligence on their part) was without the privity or knowledge of the officers and managers of the Tracy Towing Line, Inc. That Davis and his deckhand were negligent under the facts shown in this case has been established; but from that it does not follow that what Davis and his deckhand did in landing barges at tiers as a general practice, would constitute negligence under all circumstances or in a majority of instances. His practice would probably meet the needs of the situation the great majority of times, when he "landed" a barge on a tier. On the night in question, when he was landing the Jackson on a six barge tier at 34th Street, it did not measure up to the care required under the circumstances then present.

Section 183 of Title 46 U.S.C.A. which limits the shipowner's liability for injury in those instances where the act or omission is done without the privity or knowledge of the shipowner is broadly and liberally construed in favor of the ship owner to effectuate its purpose of encouraging investments in the shipping industry by enabling the owner to limit his risk to his interest in the ship. Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903; Capitol Transp. Co. v. Cambria Steel Co., 249 U.S. 334, 336, 239 S.Ct. 292, 63 L.Ed. 631; The Severance, 4 Cir., 1945, 152 F.2d 916, certiorari denied Stone v. Diamond S. S. Transportation Corp., 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626; The 84-H, 2 Cir., 1923, 296 F. 427, certiorari denied 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867; The Yungay, D.C.S.D.N.Y. 1931, 58 F.2d 352. In Coryell v. Phipps, supra, 317 U.S. 411, 63 S.Ct. 293, 87 L.Ed. 363, the Court stated the doctrine:

"In the case of individual owners it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury. The 84-H, 2 Cir., 296 F. 427; Warnken v. Moody, 5 Cir., 22 F.2d 960; Flat-Top Fuel Co. v. Martin, 2 Cir., 85 F.2d 39; and see La Bourgogne, 210 U.S. 95, 122, 28 S.Ct. 664, 673, 52 L.Ed. 973; Richardson v. Harmon, 222 U.S. 96, 103, 32 S.Ct. 27, 29, 56 L.Ed. 110; 3 Benedict, Admiralty (6th Ed.) § 489. That construction stems from the well settled policy to administer the statute not 'with a tight and grudging hand' (Mr. Justice Bradley in Providence & New York S. S. Co. v. Hill Mfg. Co., 109 U.S. 578, 589, 3 S.Ct. 379, 386, 617, 27 L.Ed. 1038) but 'broadly and liberally' so as 'to achieve its purpose to encourage investments in shipbuilding and to afford an opportunity for the determination of claims against the vessel and its owner.' Just v. Chambers, 312 U.S. 383, 385, 61 S.Ct. 687, 690, 85 L.Ed. 903."

Davis, the captain of the tug Mary T. Tracy, was known to his employer, Tracy

Towing Line, Inc., as an experienced and competent man. He had worked on vessels since 1932. He had been on freight boats; a quartermaster of a passenger vessel for two years; quartermaster on a yacht for a year; fishing for four years; and the rest of the time he had spent on tug boats. Tracy Towing Line, Inc., had employed him since May 1942. He received his first class Pilot's license in June 1943. He was pilot of the tug William Tracy for a year ending June 1944. He then became a pilot on the Mary T. Tracy. Prior to that he had been a deckhand working under licensed masters. On the night of the accident, January 22, 1946, he was first pilot, acting as master. Only Davis, another officer and the two crews were aboard the tug. They had not been in communication with his office. No one from the office staff was aboard. The crew were all experienced men, fully able to perform their duties competently. Cowin had been a deckhand for eight years. Mattison had worked on coal boats for eleven years and was a tug deckhand at least since 1942. The tug Mary T. Tracy had been overhauled and converted from coal to oil in the summer of 1945. The tug was thoroughly seaworthy. There were two crews aboard her at all times.

When Tracy Towing Line, Inc., wishes to hire a man, Mr. Collins calls the union hall of the towboat local. This is the practice as to licensed and unlicensed men. When a licensed man is hired he is not put to work right away as a master but as a pilot or mate, working under a master. Davis, when he obtained a license, was made a pilot. After he received his master's license and had been well recommended by three or four captains with whom he had worked, Davis was given a master's job.

The case at bar is not one in which there was involved structural defect or a lack of necessary equipment, concerning which the officers, managers or superintendents may be presumed to have had knowledge because the condition was of long standing. In re P. Sanford Ross, 2 Cir., 1913, 204 F. 248.

The charge here is that there was a negligent practice on the part of the tug's pilot in tieing up barges to tiers. There is no proof that the officers, managers or superintendents of the Tracy Towing Line, Inc., had any knowledge of it, if it existed. The exercise of due care and diligence in selecting competent men to man a vessel discharges the owner from that liability which privity and knowledge would impose upon him for their negligent act. The George W. Pratt, 2 Cir., 1935, 76 F.2d 902, 904. In Coryell v. Phipps, 317 U.S. 406, 412, 63 S.Ct. 291, 294, 87 L. Ed. 363, the Court held: "One who selects competent men to store and inspect a vessel and who is not on notice as to the existence of any defect in it cannot be denied the benefit of the limitation * * *."

The petitioners are entitled to a limitation of liability, to the value of the tug Mary T. Tracy. The Rambler, 2 Cir., 290 F. 791; The George W. Pratt, 2 Cir., 76 F.2d 902.

The Pennsylvania Railroad Company fulfilled its obligations under its contract to tow the Red Star No. 50 and was not negligent in tieing up its tow of three barges (the Cape Kelly, the Pershing and the Red Star No. 50) to a tier of three barges at 30th Street. The towage contract did not constitute the tug a bailee of the tow. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Harms Co. v. Erie R. R. Co., 2 Cir., 167 F.2d 562. A towing contractor is required to exercise a degree of care commensurate with the undertaking. The Margaret, 94 U.S. 494, 24 L.Ed. 146. The tug must give its tow the best mooring the situation affords. The May McGuirl, 2 Cir., 256 F. 20. If a tug leaves its tow at an intermediate point before reaching its destination, she is required to give it all needful attention and the tug takes the risk "of lack of needful attention in any changes of weather or tide." Hughes v. Pennsylvania R. R. Co., D.C., 93 F. 510, 512. The tug owed the barge the duty of reasonable care under the circumstances. The Atlas No. 5, D.C., 272 F. 171. If the tug cannot deliver its tow to her destination and ties up the tow en

route, the tug is required to tie the tow up "at some safe place and protect it until she can deliver it at the point called for". The tug is not liable if she leaves her tow over a change of tide securely tied up, when the weather is fair and there are no dangerous circumstances, and the bargee is able to take care of the lines. Tucker v. Reading Co., 2 Cir., 127 F.2d 527; The B B No. 21, 2 Cir., 54 F.2d 532.

The claimants, Red Star Towing & Transportation Co. and the Long Island Lighting Co., contend (1) that the tug Baltimore should have tied up its tow the Red Star No. 50 at the stake boat of the Pennsylvania Railroad near the Statute of Liberty, because that was a safer place than the East 30th Street bulkhead; and (2) that the East 30th Street bulkhead was a hazardous and perilous berth and was known to be such to the captain of the tug Baltimore.

Claimants argue that this 30th to 34th Street area was a very busy bulkhead in January 1946, that it was opposite the entrance to Newtown Creek on the Long Island side of the East River and was about a mile below Blackwell's Island. The channel on the Manhattan side of Blackwell's Island is more frequently used than the channel on the Long Island side. Claimants also contend that because the 30th Street bulkhead was such a busy spot, where barges were tied up in tiers and at times a barge would go adrift in a so-called "drilling" operation when a tug would take out an inside barge in a tier, that the 30th Street bulkhead was an unsafe and hazardous berth.

In an attempt to show that the shifting and drilling and adding of boats "at 34th Street" creates a hazardous condition as to moored boats, the counsel for the plaintiff by using the word "hazardous" and the words "apt to" in two questions to the captain of the Baltimore got an answer "Yes". But when the other questions and answers put to the witnesses on this point are read it appears that such work at the mooring place was "not necessarily hazardous" and was "just as safe a place as you want to make it, if you want to take your time and do it right". As the witness put

it: "Well, drilling out a single boat is a perilous job if you want to be careless about it. If you want to take your time and do your work right you can do it; but if the man goes ahead and just slaps around he can knock everybody's boat adrift". That can happen, of course, but as to the likelihood of it happening the witness said —"I have yet to see a boat knocked adrift at 30th Street in the East River." 30th Street was where the captain of the tug Baltimore had tied up the Red Star No. 50 and two other barges. If the bulkhead at 34th Street or 30th Street and the East River was a hazardous or perilous place to moor a barge, it is hard to explain how during the busy period of the war and in the aftermath thereof, there were tiers of these barges all along that bulkhead. That was the condition on January 22, 1946. It was a very busy mooring place, but competent tug captains knew that it was safe and used it. The owners of the barges also knew all about it.

The 30th Street bulkhead was not hazardous because of its exposure to weather or tides. There is a stretch of bulkheads which were constructed by the City of New York as part of its East River Drive improvement in the mid 1930s. This particular bulkhead extends from about East 30th Street to about East 34th Street, Manhattan. The position of Newtown Creek on the other side of the River, its commercial development, Blackwell's Island, the tides, general weather conditions, river traffic and the like, were all well known to the City's engineers when the improvement of the East River waterfront was undertaken on a grand scale and at great expense. It is hardly likely that this stretch of bulkheads and wharves, designed to serve the port, would be so located and constructed as to be a hazardous berth for barges used in harbor traffic.

There was no obligation on the tug Baltimore to tie up its tow of three barges at the Statute of Liberty stake boat if the 30th Street bulkhead was a safe berth. If both berths were safe, the fact that one might be considered safer than the other would not require the captain to select a safer berth about five miles away, which he had reached

at 2:46 P.M. It was a common practice to tie- up barges at this bulkhead when a tug missèd the tide. The Red Star Towing and Transportation Company knew this and so did their tug boat captains and bargees. The 30th Street berth was much nearer to the ultimate destination of the tow, which was the 96th Street rack on the East River. The master of the Baltimore was justified in continuing on from the Stake Boat to the 30th Street bulkhead. And because of the strong ebb currents in the river channel between 3 and 4 P.M. on January 22, 1946, the master of the Baltimore wisely decided to tie up his tow at 30th Street about 3:00 P.M. until the tide was more favorable.

■ I have concluded that the tug Baltimore was not negligent in tieing up its tow to a tier of three barges at 30th Street. The accident did not happen at 30th Street or result from anything the Baltimore did at 30th Street in relation to its tow. The tow was secure there and remained so for five hours. The accident happened at 34th Street, to which the three barges were moved about 8:30 P.M. by another tug (believed to be a Moran tug). If the Baltimore's tow had been permitted to remain at 30th Street, it would not have gone adrift at 10:15 with the tier of barges at 34th Street. If the Moran tug was negligent in tieing up the three barges (including the Red Star No. 50) to the tier of three already moored at 34th Street, there was an intervening negligence for which the Baltimore could not be held unless it was to be reasonably anticipated. And assuming arguendo that it should have been anticipated it was not an act of negligence which caused the accident. The tier of six barges remained securely tied at 34th Street from 8:30 P.M. to 10:15. Apparently the Eureka No. 29's lines were strong enough to hold the tier of six barges to the wharf until the added strain of the loaded coal barge Jackson was put on the Eureka's lines shortly after 10 P.M. It was that added strain, for which the Mary T. Tracy is responsible, that caused the accident and for that the Tracy tug is responsible, not the Moran tug. So we reach the point where the Red Star must assert that the negligence of the tug Mary

T. Tracy at 10:30 P.M. in attaching the Jackson as a seventh barge, after the Red Star No. 50, had been moved to 34th Street by the Moran tug at 8:30 P.M. should have reasonably been anticipated by the tug Baltimore at 3:15 P.M. when the Baltimore tied up its tow (including the Red Star No. 50) at 30th Street. This is stretching the "anticipation" so far as to be manifestly unreasonable. To this factual situation the reasoning and rule of the Circuit Court of Appeals, Second Circuit in Cleary Bros. v. Port Reading R. Co., 29 F.2d 495, 499, seem applicable. In that case the court stated the rule to be as follows: "Ordinarily the first wrongdoer is not held responsible for damages which result both from his own negligence and that of a subsequently intervening third party, unless the latter's negligence was such as the first wrongdoer might reasonably have expected to occur. (Citing cases.) This rule is commonly expressed in terms of causation—the second wrongdoer's negligence being called the proximate cause—though really its source is to be found in the courts' conceptions of policy and fairness, rather than in any factual relation of causation."

In the case at bar there is no reasonable basis for a decree against the Baltimore and its owner, the Pennsylvania Railroad Company, on any theory of liability over. As hereinabove indicated neither the tug or its owner was a bailee or insurer of the Red Star No. 50 and its cargo of coal.

Findings of fact and conclusions of law have already been filed in this case. I quote the following from the conclusions of law:

"IV. The individual petitioners are not liable for the damages sustained by the damage claimants herein, and are entitled to a decree of exoneration from all liability, without costs.

"V. The tug 'Mary T. Tracy' is liable for the damages sustained by the damage claimants herein."

"VII. Petitioner Tracy Towing Line, Inc. is liable for the damages sustained by the damage claimants herein, but with benefit of a limitation of liability to the value of the tug 'Mary T. Tracy'."

"VIII. The petitioner Tracy Towing Line, Inc. is not entitled to a decree of exoneration from all liability; but the Tracy Towing Line, Inc. is entitled to a decree of limitation of liability to the value of the tug 'Mary T. Tracy', without costs."

"IX. Red Star Towing & Transportation Co. and Long Island Lighting Company are entitled to a decree against the tug 'Mary T. Tracy', for the damages sustained, with interest and costs."

"X. Berwind-White Coal Mining Co., Thomas J. Howard and Thermal Fuel Corporation are entitled to a decree against the tug 'Mary T. Tracy' for the damages sustained, with interests, and costs."

"XIV. The libels herein should be dismissed as against The Pennsylvania Railroad Company with costs."

Settle an interlocutory decree accordingly, containing a provision for the appointment of a Commissioner to assess damages.