Petition of BOGAN.

THE PARAMOUNT III.

No. 11122.

United States District Court
D. New Jersey.

March 31, 1952.

Carpenter, Gilmour & Dwyer, by Charles B. Collins, Jersey City, N. J. (Henry T. Hornidge, New York City, of counsel), Armstrong & Mullen, by Arthur Mullen, Jersey City, N. J., for petitioner.

Frankel & Frankel, by Abraham Frankel, Ashbury Park, N. J., Albert K. Plone, by Samuel L. Supnick, Camden, N. J., Bleakly, Stockwell & Zink, by William S. Zink, Camden, N. J., Thacher, Proffitt, Prizer, Crawley & Wood, by Joseph M. Brush, Edward C. Kalaidjian, New York City, for claimants.

MEANEY, District Judge.

Petitioner, John Bogan, as owner of the motorboat Paramount III, instituted this proceeding pursuant to 46 U.S.C.A. §§ 183–185. The relief sought was exoneration from liability, or in the event that liability was found, for limitation of said liability. Trial was held without a jury, and decision reserved pending submission of briefs by the parties.

Findings of Fact

1. The Paramount III, owned by petitioner, John Bogan, was built complete, including decking over, in 1939.

2. She had an overall length, end to end, of 46 feet, and a gross tonnage of 14.98.

3. She was not subject to Coast Guard inspection, nor was she subject to the requirements of the Motor Boat Act of 1940, 46 U.S.C.A. §§ 526i, 526j.

4. Paramount III made daily trips as a party fishing boat from her berth on the Manasquan River. She went about eight or ten miles out into the Atlantic Ocean, always returning to her berth by nightfall.

5. Paramount III was powered by two gasoline-burning Chrysler engines, both equipped with back flame arresters and drip-proof carburetors.

6. Each engine had its own fuel tank, and these together with the engines and the generators were all located in the same compartment with no separating bulkhead.

7. The ventilation system for the Paramount III was as follows: two forward vents with three and one-half inch cowls, whose pipes led down to the bilges; two port holes on each side of the engine room, a total of four in all; from the rear of the engine room there was an opening thirty inches square that led to a storage space, at the rear of which there were two vents in the transom.

8. The fuel tanks were filled by means of filling pipes, about one and one-quarter inches in size, which ran down from the deck to the tanks. At the deck these pipes were surrounded by brass plates flush with the deck. The filling openings were covered by brass screw type caps which, when closed, were flush with the deck.

9. The fuel tanks had vents, three-eighths inches inside pipe size, which conformed to the Coast Guard recommendations for the year 1947 for tank vents for vessels with a tank capacity of one to one hundred gallons.

10. Both ventilation systems (that for the engines and that for the fuel tanks) were adequate and in conformity with the Coast Guard recommendations in effect at the time of the construction of the Paramount III.

11. No stove or flame-producing device was carried on the boat.

12. The Paramount III had a master, Captain Charles Fuchs, now deceased, and a crew of one, Frank Brown, the deckhand.

13. Captain Fuchs was a licensed motorboat operator. He was a competent master and had a good reputation in his profession.

14. Prior to and at the time of the explosion, said vessel was licensed for the coasting trade and mackerel fishery by the Bureau of Marine Inspection and Navigation of the Department of Commerce, for the year 1947, by various extensions of the license granted in 1942. Her original license, issued the year she was built, in 1939, was for coasting trade, passenger service, only.

15. The Paramount III was used for the carrying of passengers desirous of engaging in offshore, deep-sea fishing.

16. On September 13, 1947, the day prior to the explosion, a leak was discovered in the gas line leading to or from the carburetor of the port engine. This was discovered on the way out to the fishing ground. It was repaired by Captain Fuchs on the same day, and the boat operated under both engines for the rest of the day.

17. Petitioner Bogan made daily inspections of the Paramount III, particularly testing for gas fumes and leaks. In addition, he had instructed Captain Fuchs to carry out specific safety precautions and inspection procedures before starting the engines.

18. The day of the explosion (September 14th) was a partly cloudy day with light rain and very little wind.

19. Prior to and at the time of the explosion the Paramount III was lying alongside the bulkhead, starboard side to, heading southwest at the Bogan wharf, in the Manasquan River Yacht Basin at Brielle, New Jersey.

20. In accordance with usual custom, those persons who were going out to fish that day on Paramount III, had come aboard and were on board at the time of the explosion.

21. These persons had not yet paid their fares as it was customary to collect these on the way out to the fishing grounds, after the boat had left the wharf.

22. Prior to the starting of the engines, Brown, the deckhand, went down into the engine room to turn on the gasoline valves. He detected no gasoline odors, but did not smell for or look for any leaks.

23. Various passengers testified that they smelled gasoline odors while standing on the deck prior to the explosion, while one or the other engine was running.

24. The starboard engine was started first and ran for about fifteen minutes, and then was shut down. The port engine was then started, ran for between ten and fifteen minutes and while still running, the explosion occurred.

25. As a result of the explosion one person was killed and several others sustained personal injuries and property damage.

26. On subsequent inspection it was found that the starboard fuel tank was fractured at the top near the deck filling line. The port tank was found to be intact and showed no signs of leakage anywhere.

27. There had been a fire which had centered around the two engines and above the engine room floor boards. It had run up both the port and starboard sides and back to both fuel tanks. In addition, the pilot house was badly burned and the deck had been burned and raised up.

28. There was no evidence of fire having touched the engine room bilges.

29. The explosion was caused by excessive internal pressure resulting from the heating of the liquid which was in the tank.

30. The fire was caused by the ignition of gas fumes in the engine space.

31. Gas vapors being heavier than air will seek the lowest level. Significantly, there was no evidence of fire in the lowest level, the bilges.

32. Both engines had passed the "starting point." This is the time at which the danger of explosion is greatest.

33. Any gas vapors which were present after the passing of the starting point would have been consumed by the operation of the engines, and the atmosphere would have been renewed.

34. Coast Guard Inspector Maguire found no objective evidence which would warrant the taking of disciplinary action against the master.

### Discussion.

The pertinent statutory provisions are contained in 46 U.S.C.A. §§ 183–185. These provide in substance that an owner of a vessel may limit his liability for damage where the loss was occasioned without his privity or knowledge.

Petitioner Bogan, since he is the owner of the Paramount III, is clearly entitled to bring this proceeding.

■ We first proceed to an inquiry as to whether there is liability, for without liability there would be nothing to limit. See Petition of Liverpool, Brazil & River Plate Steam Nav. Co., 2 Cir., 1932, 57 F.2d 176. The burden of proof as to the existence of this element rests upon the claimants. See The Vera III, D.C.E.D.N.Y., 1938, 24 F.Supp. 421. However, it is contended that in a case of this type the doctrine of res ipsa loquitur applies, and thus on proof of an explosion of extraordinary character, occurring out of the ordinary course of events, while the vessel was in the exclusive control of the petitioner, an inference of negligence is warranted. See Austerberry v. United States, 6 Cir., 1948, 169 F.2d 583.

This doctrine has been held to apply in admiralty cases. See Austerberry case, supra; Leathem Smith-Putnam Navigation Co. v. Osby, 7 Cir., 1935, 79 F.2d 280. Particularly has it been applied in situations where there was an explosion and a fire in a confined space, caused by the ignition of gas fumes. See Austerberry and Leathem cases, supra.

■ In the instant case the fact of the explosion has been established. The explosion was extraordinary in character, out of the ordinary course of events, and occurred while the vessel was in the exclusive control of the master. Therefore the application of res ipsa is justified and warrants an inference of negligence on the part of the master.

■ The burden of proof now shifts to the petitioner and places upon him the duty of proving his right to limit his liability. See The Vera III, supra. This right exists only where the damage was occasioned without the privity or knowledge of such petitioner-owner. See 46 U.S.C.A. § 183(a).

■ In the case of an individual owner, privity or knowledge used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury. See Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363. It therefore becomes the duty of the Court to see whether the petitioner participated in the negligence of the master.

The evidence shows that the petitioner was not at the scene of the explosion until after it happened. He testified to having made daily personal inspections of the Paramount III for leaks and also to having given specific instructions to the master for the conduct of inspections. In addition there was testimony that the master was a licensed operator, fully competent and with a fine reputation.

■ Where such facts are established, and in the absence of further pertinent statutory pronouncement, it is generally held that the owner may limit his liability. See Coryell case, supra; Petition of Tracy, D.C.S.D.N.Y.1950, 92 F.Supp. 706; The Trillora II, D.C.E.D.S.C.1947, 76 F.Supp. 50; The Spare Time II, D.C.E.D.N.Y. 1941, 36 F.Supp. 642. Of course where the owner has knowledge of the condition, he cannot secure limitation even where he has properly delegated his duty. See The Silver Palm, 9 Cir., 1937, 94 F.2d 776.

However, the statute also provides that in the case of "seagoing vessels" the privity or knowledge of the master at or pri-

or to the commencement of each voyage, shall be conclusively deemed to be the privity or knowledge of the owner. See 46 U.S.C.A. § 183(e). Under this subsection our first inquiry is whether Paramount III is a "seagoing vessel." Section 183(f) provides that " * * * the term 'seagoing vessel' shall not include pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels or their tenders, self-propelled lighters, nondescript self-propelled vessels, canal boats, scows, car floats, barges, lighters, or nondescript non-self-propelled vessels * * *." See 46 U.S.C.A. § 183(f).

The Paramount III was, in common parlance, a party fishing boat. As such her berth was in the Manasquan River and her normal operation was down the River and some eight to ten miles out into the Atlantic Ocean. She was never out overnight but spent the nights tied up at her berth.

It is the contention of the petitioner that Paramount III was a fishing vessel within the meaning of the statute and thus not included within the term "seagoing vessel" as used in section 183(f). The statute refers, in plain words, to fishing vessels. If Paramount III is a fishing vessel, then it should not be included within the meaning of "seagoing vessel" if we are to give effect to the statute as it stands. If the boat is not a "seagoing vessel", then section 183(f) has no application in this matter.

■ First of all rises the question of what constitutes a seagoing vessel. Patently any vessel which is engaged in foreign, coastwise or intercoastal commerce is a seagoing vessel, no matter where she may be located or berthed at any particular time, or in what limited harbor or river traffic she may be engaged on specific occasions. And it would seem entirely logical that any vessel which regularly sailed "outside the headlands or fauces of a harbor, or .* * outside the boundaries of 'inland waters'

as established by a competent authority, * * *" is seagoing. See Benedict on Admiralty, 6th Ed., Vol. 3, p. 405.

■ If this question were to be settled by the conclusion that the Paramount III is a "seagoing vessel", the next matter for determination would be the question of whether she was a fishing vessel within the comprehension of R.S. § 4283, 46 U.S.C.A. § 183. She was licensed for the coasting trade and mackerel fishery. At first blush, this would seem to indicate that she was within the excepted classification of subsection (f), 46 U.S.C.A. § 183. But the vessel was actually used, not for commercial fishing, but rather for carrying enthusiastic amateur piscators to available fishing grounds off the Jersey Coast, outside Manasquan Inlet. Indeed, when the vessel was originally licensed in 1939, she was licensed for coasting trade, with the specific indication that it was for passenger service. It would seem that Congress in excepting "fishing vessels", had in mind those vessels engaged in catching fish as a regular business and for purposes of commerce and trade.

Having in mind the findings of fact arrived at, and the statutory provisions above referred to with their logical connotations, the Court arrives at the following

### Conclusions of Law

1. The explosion on board the Paramount III was such an accident as warrants an inference of negligence on the part of the master.

2. The Paramount III was a seagoing vessel.

3. It was not a fishing vessel within the meaning of the statute.

4. There was privity or knowledge on the part of the owner.

5. Petitioner, therefore, is not entitled to limit his liability.

Let an order be submitted in conformity herewith.