## MARTIN MARINE TRANSP. CO. v. UNITED STATES.

### No. 131.

District Court, E. D. Pennsylvania.

April 12, 1946.

Rawle & Henderson and Harrison G. Kildare, both of Philadelphia, Pa., for libellant.

Gerald A. Gleeson, U. S. Dist. Atty., E. D. of Pa., of Philadelphia, Pa., and Charles R. Sheidy, Jr., Asst. Dist. Atty., E.D. of Pa., of Reading, Pa., for defendant.

GANEY, District Judge.

This is a suit in admiralty to recover damages to the tug Eureka which resulted from the parting of the mooring lines of the barge Darien which in turn is alleged to have been caused by the excessive swells of a Coast Guard picket boat in the Chesapeake and Delaware Canal.

Primarily for disposition is the correctness of a ruling that the respondent was not precluded from offering evidence after its motion at the close of libellant's case had been overruled. The court in The Persiana, D.C.N.Y., 158 F. 912, held: "It has been the uniform practice of this court not to entertain motions to dismiss at the close of libellant's case, unless the claimant or respondent also rests. If the party defendant considers that any testimony is necessary to overcome that offered by libellant, it should be produced, and the court not asked to dispose of the litigation before all the testimony is submitted." In accordance with this point of view is also Bull v. New York & Porto Rica Steamship Co., 2 Cir., 167 F. 792.

Accordingly, it would seem that the ruling was in keeping with the settled practice in admiralty.

From the testimony submitted the court makes the following findings of fact:

(1) The tug Eureka is a steam tug owned by libellant, Martin Marine Transportation Company. The length of this tug is 128 feet, its beam is 26 feet and its draft is 15.6 feet. At all times prior to the time she suffered damages on May 11, 1944, the Eureka was seaworthy and in good condition.

(2) The Coast Guard picket boat, CG–38614, is a vessel owned by respondent, the United States of America, and is used by members of the United States Coast Guard Service in the performance of their duties. The length of the CG–38614 is 38 feet, its beam is 10 feet and its draft is 3 feet.

(3) The barge Darien is a coal barge without motive power, 355.8 feet in length and 52.1 feet beam.

(4) The tug Caspian is a steam tug, 80 feet in length, 21 feet beam and a draft of 12 feet, owned by the libellant.

(5) On May 10, 1944, the tugs Eureka and Caspian were engaged in towing the barge Darien, loaded with 7,318 short tons of coal, eastwardly through the Chesapeake and Delaware Canal from Town Point to Reedy Point. At that time, the tug Eureka was made fast to the starboard quarter of the barge and the tug Caspian was made fast to her port quarter. The flotilla was under the command of Captain David C. Reich of the Tug Caspian.

(6) At about 12:15 a.m., May 11, 1944 when the flotilla arrived at a point in the canal opposite Scott's Run, it encountered fog.

(7) By reason of fog, the flotilla tied up at the mooring dolphins located on the north side of the Canal west of Reedy Point and approximately 3 miles east of Scott's Run at approximately 1:30 a.m.

(8) The barge with her bow facing east was made fast to the mooring dolphins, with two bow lines leading forward, one spring line from the after end of the port forecastle head leading aft, and two stern lines leading aft. The lines were seven and eight inch sisal lines, several months old and had been used frequently before.

(9) The shelf of the Canal at the location where the barge was moored consisted of sand covered with soft mud. It sloped outward and downward at an angle of thirteen degrees until it reached the edge of the channel 30 to 45 feet south of the dolphins where it dropped suddenly, forming the side of the channel.

(10) Although the berth at the mooring dolphins was not a convenient place, except at high tide, to moor a ship with a draft as deep as that of the barge Darien, Captain Reich considered that it was safer to moor the barge there than to proceed out into the Delaware River in the foggy weather.

(11) At high tide the mooring dolphins were 20 feet under water; at low tide they were 15 feet under water.

(12) According to the United States Department of Commerce, Coast and Geodetic Survey Tide Tables, Atlantic Ocean, 1944, high tide was at 1:54 a.m. (EWT) and low tide was at 8:52 a.m. (EWT). However, these times vary in different locales and in the Chesapeake and Delaware Canal, a narrow canal, connecting two rivers, the variation in time may amount to an hour. When the tide is rising in the Canal, the current runs west; when the tide is falling, the current runs east.

(13) At 6 a.m. the position of the tug Caspian was changed from the starboard bow of the barge to a position on the starboard side of the tug Eureka, with a single line to the tug Eureka. The tug Eureka was fastened to the starboard quarter of the barge by means of three lines.

(14) Although the tide was continually falling, no attempt was made after 5 a.m. by the Captain of the flotilla or any other member of the crew to slack the taut mooring lines of the barge in order to decrease the increasing strain placed on the lines by the traction of the barge which tended to slide down the shelf of the canal with the fall of the tide, and by the force applied by the increasing flow of the current against the flotilla.

(15) Shortly after 9 a.m. the barge Darien was at an angle with the dolphins.

The mooring lines of the barge were taut. The bow was 6 to 8 feet and the stern 20 to 25 feet from the row of mooring dolphins. The barge had a slight starboard list, the bow was resting on the shelf of the canal, the stern was afloat. The vessels in the flotilla were relatively in the same position as they were at 6 a.m., the port side of the tug Caspian extending 125 feet from the mooring dolphins. The tugs had steam up. The fog had not lifted; visibility was about ½ mile; there was a slight southeast breeze. The current in the Canal was running eastwardly at the rate of approximately 2 to 2½ miles per hour, the tide was still falling. Other vessels, smaller in size than the barge Darien were also moored to the dolphins.

(16) At about 9:15 a.m. the Coast Guard picket boat CG–38614 approached the flotilla traveling westwardly just right of center of the channel at a distance of approximately 50 feet south of the tug Caspian and about 80 to 90 feet south of the barge Darien. The picket boat was proceeding against the current, with her engine turning over at the rate of 1,000 revolutions per minute, which produced a speed of 5 to 6 miles per hour over the ground, since she was running against the current.

(17) The picket boat, traveling in the above manner, was obeying all the rules of the road and was not negligently operated, and under the circumstances did not cause an execessive swell or bow wave.

(18) When the picket boat passed the flotilla and the bow wave of not more than 18 inches reached the bow of the barge, the stern lines of the barge parted at the eyes (the ends which were around the dolphins) with a snap. The stern of the barge, which was the only part of the barge afloat, began to swing southeastwardly toward the opposite side of the Canal.

(19) When the Captain of the tug Eureka became aware that the barge's stern was swinging toward the center of the channel, he went full speed ahead with a right rudder in order to force the stern of the barge toward the dolphins. The tug Caspian immediately swung her stern out from the tug Eureka in order to be in a position to push against the starboard side of the tug Eureka. When the tug arrived in this position a moment later, Captain Reich applied full speed ahead on the tug Caspian and ordered the tug Eureka to go full speed astern.

(20) In spite of the efforts of the tugs, the force of the current continued to swing the stern of the barge out toward the center of the channel which at this point was less than 300 feet wide.

(21) Captain Reich ordered the barge to cast off her bow lines in an attempt to prevent the stern of the barge from swinging directly across the channel and thus to forestall the blocking of the channel by the barge.

(22) The tug Eureka immediately began to cast off the several lines which held her to the barge, but before the operation could be completed, the starboard quarter of the barge Darien pinned the tug Eureka against the south edge of the channel, causing damage to her port side and superstructure.

(23) It took the barge three minutes to reach the south bank of the channel from the time that her stern lines parted.

(24) The parting of the mooring lines of the barge Darien was due to the excessive or undue strain placed upon them by the unseaworthy manner in which the barge was moored. The lines would not have parted if they had been slacked to permit the barge to remain in deep enough water to keep her afloat at all times, or if one of the flotilla's crew had stood by and slacked the lines from time to time to permit the barge to move away from the dolphins into deeper water so that the barge would not rest on the shelf of the canal as the tide fell.

(25) After the tug was pinned against the south bank of the channel, no complaint was made to any of the personnel of the Coast Guard picket boat CG–38614 by any member of the crew of the flotilla, nor were they asked to render or summon assistance, despite the fact that the picket boat and its personnel were in the immediate vicinity of the accident for approximately 15 minutes after the grounding of the tug Eureka.

## Conclusions of Law

(1) The matter in controversy is within the admiralty and maritime jurisdiction of the United States and of this court.

(2) A duty existed on the libellant to moor the barge Darien in a seaworthy and proper manner so that other vessels navigating the Canal in an ordinary and reasonable manner under the circumstances could do no harm to the barge. The libellant was negligent in failing to discharge this duty.

(3) The Coast Guard picket boat CG–38614 was proceeding at a lawful speed under the circumstances.

(4) Under all the evidence in the case, libellant has failed to prove any negligence on the part of the respondent in causing the Darien to break loose from her mooring.

(5) The negligent manner in which the Darien was moored and the improper manner in which the tug Eureka was manuevered after the breakaway were the sole causes of the damage suffered by the tug Eureka.

(6) The respondent is entitled to a decree against the libellant dismissing the libel with costs, in accordance with this opinion.

## Discussion

In the disposition of claims for damages resulting from swells produced by another vessel, it is to be remembered that each case depends upon its own special facts. The Daniel Drew, 6 Fed.Cas. 3,565, p. 1165; The Ferryboat Columbia, 1937 A. M.C. 881. The general rule, however, is: "Where a vessel properly moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way; and it is presumptively liable until the contrary is shown, the burden of doing which is upon the vessel under way." The Rotherfield, D.C., 123 F. 460, 461.

However, before this rule of law is applicable, it must be shown that the vessel was properly moored; and accordingly the question is posed in the instant case as to whether or not the barge Darien was properly moored. "The mere evidence that damage results from the swells of a passing vessel is not enough to base a recovery upon". The New York, 2 Cir., 167 F. 315. Just as a duty exists on a moving ship not to throw damaging swells under the circumstances, so does a duty exist on a ship to be seaworthy and moored in such a manner that a situation will not be created whereby the ordinary and reasonable swells created by a passing ship in such a locale will result in damage to the moored ship. The LaSavoie, D.C., 157 F. 312; The St. Paul, D.C., 171 F. 606; The Favorita, D.C., 43 F.2d 569, 1930 A.M.C. 1435; The Alexander Hamilton (The Jim & Bill), D.C., 4 F.Supp. 258, 1933 A.M.C. 968. The moving ship is not an insurer, and is not liable for all damages that occur as a result of its swells. Ferryboat Columbia, supra. The evidence, as indicated heretofore in the findings, did not show the Darien was properly moored and hence the above rule of law is inapplicable.

Accordingly, I find that the libellant has failed to prove by a fair preponderance of the evidence that the Coast Guard picket boat CG–38614 was negligently and carelessly navigated, so that it caused unusual swells dangerous to a boat properly moored, or that the tug Eureka received any damage at the hands of the Darien, which was caused or contributed to by the Coast Guard cutter, CG–38614, and the Coast Guard cutter is therefore without fault; that the damages suffered by the tug Eureka were caused by the negligence of the libellant in mooring the barge Darien in an improper and unseaworthy manner by failing to ease the tautness of her lines thereby causing an undue strain thereon, which could have been obviated by slackening of the same by proper supervision. Myrtle-Heina, 1927, A.M.C. 1114; Ormond, 1928 A.M.C. 101; Boston, 1931 A.M.C. 1217; Berengaria, 1933 A.M.C. 111; Shamrock Towing v. N. Y. City, 27 Fed. Supp. 911, 1939 A.M.C. 1076.

Therefore, the respondent is entitled to a decree.