In the Matter of the Complaint of PA-
DUCAH TOWING COMPANY, INC.,
et al., Claimants-Appellees,

UNITED STATES of America,
Plaintiff-Appellee,

v.

PADUCAH TOWING COMPANY, INC.,
Defendant-Appellee,

Exxon Corporation, Third Party
Defendant-Appellant.

No. 81–5380.

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1982.

Decided Nov. 2, 1982.

Robert L. Sloss, Francis J. Mellen, Jr., Wyatt, Tarrant & Combs, Bert Combs, Louisville, Ky., for third party defendant-appellant.

James L. Hardy (Paducah Towing), Hardy, Terrell & Boswell, Paducah, Ky., Gary T. Sacks (Paducah Towing), Goldstein & Price, St. Louis, Mo., for defendant-appellee.

Alexander P. Taft, Jr., U.S. Atty., Louisville, Ky., James A. Lewis, U.S. Dept. of Justice, Admiralty & Shipping Section, Washington, D.C., for plaintiff-appellee.

Richard Roberts (claimants) Mark Whitlow, Whitlow, Roberts, Houston & Russell, Paducah, Ky., for claimants-appellees.

Before MERRITT, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

CELEBREZZE, Senior Circuit Judge.

In this admiralty action, Exxon Corporation appeals from a decision of the district court for the Western District of Kentucky holding Exxon completely liable for the damages resulting from an accident on the Ohio River. Paducah Towing Co. filed a petition for exoneration from or limitation of liability for the occurrence. 46 U.S.C. Secs. 181–95. The district court exonerated Paducah Towing from liability and held that it is entitled to contribution or indemnity from Exxon for any damages it is required to pay. Exxon appeals the district court's decision pursuant to 28 U.S.C. 1292(a)(3). Because the district court erred in finding Exxon solely liable, we reverse and remand this case for further proceedings.

### I.

Paducah Towing's tow boat, the Endeavour, with a tow of the claimants'[1] barges,[2] was proceeding downstream on the Ohio River on June 3, 1977. The Endeavour, whose destination was Cairo, Illinois, arrived in the late morning of June 3 at the upstream side of Lock and Dam No. 53.

The lock is large enough to accommodate only tows less than 600 feet in length. If a tow boat and its barges exceed 600 feet, they must split and pass through the lock in separate "cuts." In order to handle large tows, the lock system requires a tie-off tow to act as a temporary mooring point above the lock. As tow boats and barges pass through the lock upstream in cuts, tugboats pick up the first cut and deliver it to the tie-off tow. After passing through the lock, the tow boat, with the second cut, must reassemble its entire tow and continue on its way. The United States Army Corps of Engineers designed the "self-help" procedure to improve passage through the lock system.[3] Two tugboats, the Southeastern and the Thomas W. Martin, assisted in the tow operation upstream from Lock 53.

---

1. The claimants are Union Mechling Corp., National Marine Service, Inc., American Commercial Lines, Inc., Southland Towing Company, American Commercial Barge Line Company, Commercial Transport, and Federal Barge Lines, Inc.

2. The Endeavour's tow comprised sixteen barges: fourteen regular-size and two approximately half-size barges. The tow had three barges abreast and was five barges long. The Endeavour and its tow were approximately 1,000 feet in length.

3. The "self-help" program, adopted at Lock 53 approximately nine months before the accident, is designed to expedite passage through the 600-foot locks on the Ohio River. Before this program, a tow boat which, along with its barges, exceeded 600 feet in length could pass through the locks only through a complicated procedure: the tow would divide its barges, tie one cut to the shore, maneuver itself and the other cut through the lock, tie that cut to the shore on the far side of the lock, return and pick up the first cut, maneuver it through the lock, and then combine the two cuts before proceeding on its way.

The "self-help" program avoids these complex maneuvers and long delays: tug boats waiting above and below the lock assist in the lockage of long tows. The long tow divides its barges and places the first cut in the lock; a helper boat picks up this cut on the other side and ties it off to a volunteer tie-off tow; the long tow boat then brings the second cut through the lock, picks up the first cut, and proceeds on its way. The tie-off tow is a vessel which, while waiting to pass through the lock, volunteers to act as a temporary mooring point under the self-help program. See note 20 and accompanying text, infra.

The Endeavour had a crew of seven men: Captain Charles Duncan, a mate named J.C. Bachuss, an assistant engineer named Reeves, and four deckhands.[4] Mark Metcalf, one of the deckhands, was eighteen years old and had only eight days of experience at the time of the accident. Two of the other deckhands had just joined the Endeavour's crew.

The Endeavour arrived at Lock 53 in the late morning of June 3. The lockmaster asked Duncan to allow the Endeavour to serve as a tie-off tow above the lock. Duncan moored the stern of the tow, with its starboard side facing the shore, to an unoccupied construction barge located approximately 2,000 feet above the lock. The construction barge, in turn, was moored to a tree on the right descending (Illinois) shore with a one-inch steel cable. Duncan and Bachuss examined the cable which held the construction barge from the Endeavour with a pair of binoculars. They were apparently satisfied that the cable was of sufficient strength to withstand the stress of mooring the construction barge, the Endeavour, its tow, and any other tow which might be attached pursuant to the self-help program. After tying off, Duncan ordered the crew to shut off the Endeavour's engines.

At some time between 9:00 p.m. on June 3 and 1:00 a.m. on June 4, a cut of barges from an unidentified tow was tied off to the Endeavour. The second cut then passed through the lock. The tow was reassembled, and continued on its way without incident. At approximately midnight on June 3, Duncan entrusted Metcalf with the pilothouse watch. Duncan instructed Metcalf to check the moorings periodically, to listen for radio communications, and to call in the event of a problem.[5] Duncan went off duty to sleep.

At approximately 1:00 a.m. on June 4, the Exxon-Tennessee, with a tow of eight fully-loaded barges, began to pass through Lock 53 in two separate cuts, heading upstream on the Ohio River. The Thomas W. Martin, the helper tow, took the first cut through the lock and tied it to the Endeavour. During this maneuver, the Tennessee took the second cut through the lock chamber and moved upstream to the Endeavour. As the Tennessee approached the Endeavour, the Thomas W. Martin was leaving, having finished tying off the first cut. The Tennessee assembled the two cuts[6] and moved sideways in the river from the Endeavour with the use of bow thrusters.[7] While it pulled away, the Tennessee's crew tightened the wires which connected the two cuts. The Tennessee then proceeded upstream.[8]

Although the timing of the following events is disputed, the Endeavour and the construction barge broke loose from the mooring and began drifting towards the dam shortly after the Tennessee left the area. Duncan, who had arisen to go to the bathroom, looked out and realized that the

4. The Endeavour's pilot, Michael Chism, had jumped ship at Paducah during the early morning hours of June 3. The chief engineer also apparently left the ship in Paducah. Captain Duncan immediately notified his employer's president, Bud Stroder, of the pilot's departure. Mr. Stroder began to search for another pilot and instructed Captain Duncan to continue downstream.

5. Metcalf apparently had never before stood watch in the pilothouse, was unfamiliar with the operation of the radio, had no radio operator's license, and had very few instructions from or conversations with Duncan.

6. The Tennessee's tow consisted of eight integrated barges equipped with air winches. The integrated barges are connected with pins and matching holes; the barges are designed to operate as a single unit. The air winches are used to pull the barges together so that they may be pinned and wired. The tow of fully loaded barges weighed approximately 24,000 tons.

7. The Tennessee's bow thruster is a 500 horsepower inboard engine located near the end of the tow. The thruster allows the Tennessee to move laterally through the water. The Tennessee also has kort nozzles, designed to direct the force of propellers directly behind the vessel and, thus, reduce the turbulence from the vessel's wheel wash.

8. The Tennessee's log shows that the operations at Lock 53 were completed at 2:30 a.m. on June 4.

Endeavour was adrift. He went directly to the wheelhouse and told Metcalf that the boat was adrift and that he should wake the crew. Duncan attempted to start the engines and radio for help. The Thomas W. Martin and the Southeastern attempted, but failed, to rescue the Endeavour. The Endeavour, the claimants' barges, and the construction barge went over the dam.

On September 20, 1977, the United States Coast Guard investigated the accident and recommended that license revocation proceedings be commenced against Duncan. In November, 1977, an administrative law judge held a license revocation hearing. A non-lawyer warrant officer represented the Coast Guard and Paducah Towing's attorney represented Duncan. The administrative law judge determined that Duncan had not improperly moored the Endeavour; he suspended Duncan's license for two months, with the suspension remitted for twelve months of probation, because of an improper posting of documents on the barges.

On December 1, 1977, Paducah Towing filed a petition for exoneration from or limitation of liability for the accident. Paducah Towing alleged that the Tennessee caused the accident and that Exxon should be required to indemnify Paducah Towing for all damages that it might be required to pay. The United States filed claims against Paducah Towing for damage to Dam No. 53; the claimants filed claims against Paducah Towing for damage to their barges and cargo. In May, 1978, the United States filed a separate action under 33 U.S.C. Sec. 408 against Paducah Towing for damage to Dam No. 53. Paducah Towing filed a third-party complaint against Exxon for indemnity.

The district court consolidated the two cases and then bifurcated the consolidated case for an initial trial on liability, reserving the determination of the damages issues. On January 19, 20, and 21, 1981, the district court heard the consolidated case. On January 29, 1981, the district court entered an order which held that the United States, based on a strict liability theory

under 33 U.S.C. Sec. 408, was entitled to recover from Paducah Towing for all damage to the dam resulting from the collision. On April 15, 1981, the district court, in a memorandum opinion, held that Paducah Towing was entitled to indemnity from Exxon for the full amount of damages paid to the United States and that the claimants were entitled to judgment from Exxon for the full amount of damage to their barges and cargo. Exxon appeals the district court's order and argues that the district court improperly relied on inadmissible evidence and clearly erred in its decision to exonerate Paducah Towing.

II.

At trial, the district court admitted a transcript of James Cole's [9] testimony at the license revocation proceeding. The district court also admitted the factual findings of the administrative law judge who presided at the revocation proceeding. Exxon objected to the admission of this evidence, asserting that the evidence was inadmissible hearsay. The district court concluded that Cole's testimony was admissible under Fed.R.Evid. 804(b)(1) and that the ALJ's findings were admissible under Fed.R.Evid. 803(8)(C).

At the license revocation hearing, Cole was called as a witness by Chief Warrant Officer Riggs, who represented the United States Coast Guard. On direct examination, Cole recounted the events he observed in the early morning hours of June 3, 1977. On cross-examination, Captain Duncan's counsel attempted to qualify Cole as an expert witness. Duncan's counsel questioned Cole, by means of hypothetical questions, regarding the reasonableness of Duncan's actions. Cole's responses were uniformly favorable to Duncan. On redirect examination, the ALJ refused to allow Riggs to impeach Cole's credibility. The district court admitted the transcript of this testimony under Fed.R.Evid. 804(b)(1). The ALJ's findings, which were based upon the testimony of Cole and other witnesses, indi-

---

**9.** Cole was the pilot of the Southeastern and an eyewitness of the accident. *See* note 14, *infra.*

cated that Duncan, as captain of the Endeavour, had acted reasonably in mooring the Endeavour and setting the watch as he did. In its memorandum opinion, the district court relied heavily upon the ALJ's findings.

Exxon asserts that Cole's testimony was inadmissible under Rule 804(b)(1) [10] because it, or a predecessor in interest, did not have an opportunity to develop Cole's testimony in the license revocation proceeding by cross or direct examination.[11] Paducah Towing argues that the Coast Guard officer had a similar interest and motive to develop Cole's testimony and, thus, that the evidence was admissible. We believe that, even if the Coast Guard were Exxon's predecessor in interest, the evidence is not admissible because neither Exxon nor its predecessor had a meaningful opportunity to examine Cole.

 Rule 804(b)(1) requires that the party against whom the evidence is offered or a predecessor in interest must have an opportunity to develop the testimony by direct, cross, or redirect examination. The opportunity to examine the declarant provides safeguards similar to the circumstantial guarantees of trustworthiness found in other exceptions to the hearsay rule. *United States v. Thevis,* 84 F.R.D. 57, 63 (N.D. Ga.1979). *See* Notes of Advisory Committee on Proposed Rule 804(b) ("[f]ormer testimony does not rely on some set of circumstances to substitute for oath and cross-examination, since oath and cross-examination were present in fact"). *See generally Ohio v. Roberts,* 448 U.S. 56, 73, 100 S.Ct. 2531, 2542, 65 L.Ed.2d 597 (1980) (opportunity to cross-examine an indication of reliability). Because the opportunity to develop the former testimony is necessary to ensure the trustworthiness of that testimony, the prior testimony should not be admitted unless such an opportunity was afforded. *See United States v. Wingate,* 520 F.2d 309, 316 (2nd Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (prior testimony not admissible against government when government lacked meaningful opportunity to cross-examine); *United States v. Amaya,* 533 F.2d 188 (5th Cir. 1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); McCormick on Evidence Sec. 255 at 616 (2nd Ed. 1972). *See also Hicks Co., Inc. v. I.R.S.,* 470 F.2d 87 (1st Cir. 1972) (under prior practice evidence admitted only if examination is complete). If a meaningful opportunity to develop the former testimony was not afforded, then the testimony may properly be assumed to be less reliable. Furthermore, fairness requires that a party, such as Exxon, should not be burdened by an inadequate examination conducted by a predecessor in interest. *See generally* H.R.Rep. No. 650 93rd Cong.2d Sess. (1973) 4 U.S.Code & Admin.News pp. 7051, 7088 (1974). This consideration, however, is closely related to the need to admit only former testimony which has been adequately tested by full examination because a party such as Exxon is prejudiced only to the extent that unreliable hearsay is admitted; thus, the opportunity for full examination of the declarant serves to protect both the court and the parties from unreliable evidence.

 We believe that Cole's testimony was not admissible under Rule 804(b)(1) because neither Exxon nor its assumed predecessor in interest had a meaningful opportunity to fully examine Cole. *See Matter of Sterling Navigation Co. Ltd.,* 444 F.Supp. 1043, 1047 (S.D.N.Y.1977). *Cf.* Weinstein &

---

**10.** Fed.R.Evid. 804(b)(1) provides:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predeces-

sor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**11.** Exxon also asserts that Paducah Towing did not adequately demonstrate that Cole was unavailable to testify, as Rule 804(b)(1) requires. Because we conclude that Cole's testimony was inadmissible in any event, we need not decide that issue.

Berger, 4 *Weinstein's Evidence.* Par. 804(b)(1)(02) (1981). We reach the conclusion that the evidence must be excluded because the predecessor, United States Coast Guard, was not represented by an attorney and because the scope of the Coast Guard's redirect examination was improperly limited.

Generally, if a party proceeds without an attorney in the first proceeding, prior testimony is admissible under Rule 804(b)(1).[12] Here, however, the Coast Guard's decision to proceed without an attorney has substantially prejudiced Exxon and has resulted in the admission of unreliable testimony. Although Cole was called by the Coast Guard, his expert opinion was elicited on cross-examination by Duncan's counsel. The Coast Guard officer, who was not an attorney, did not challenge Cole's qualifications as an expert. The transcript of Cole's testimony indicates that the officer did not possess the skills that one would expect of a marginally competent attorney. Because Cole's testimony was not adequately tested, we know little about his qualifications as an expert;[13] we do not know whether Cole's testimony reflects his true opinion that Duncan acted reasonably or whether his expert opinion seems to support Duncan's position because Duncan's counsel artfully phrased his hypothetical questions.

The inadequacy of the Coast Guard's representation was exacerbated by the ALJ's refusal to allow the Coast Guard officer to impeach Cole, his own witness. Because of this restriction, the officer could not challenge Cole's expert credentials as was permitted under Fed.R.Evid. 612. Also, the officer could not inquire into the basis and underlying assumptions which supported Cole's opinions.[14]

The limited scope of the redirect, which should have been, in effect, a cross-examination by the Coast Guard, and the ineffectiveness of the officer's examination, leads us to believe that the examination of Cole was not adequate to provide the necessary measure of assurance regarding the reliability of Cole's testimony. The direct examination is completely unrelated to Cole's expert testimony because it only concerned Cole's observations of historical fact. The redirect examination is of even less value; it was limited to one question which was struck from the record as an impermissible attempt to impeach Cole. Because the examination conducted by the Coast Guard was not adequate to provide even minimal assurance of reliability, we cannot say that Exxon, or its predecessor in interest, "had an opportunity ... to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Consequently, the requirements of the rule were not satisfied, and the district court abused its direction by improperly admitting the testimony into evidence.

Exxon also challenges the admissibility of the ALJ's findings of fact. It asserts that the findings of the ALJ are really evaluations or opinions, which are not admissible under the Rule 803(8)(C).[15] *E.g. Smith v. Ithaca Corp.,* 612 F.2d 215, 222 (5th Cir.

---

**12.** *See* 5 Wigmore, Evidence Sec. 1371; Weinstein & Berger, 4 *Weinstein's Evidence,* Par. 804(b)(1)(02) (1980).

**13.** The transcript indicates only that Cole had spent ten years working on the river. It does not indicate in what capacity Cole worked upon the river, how long he had held his pilot's license or how long he had worked upon the Southeastern.

**14.** *See* Fed.R.Evid. 705. *See also* Notes of Advisory Committee of Proposed Rule 804(b)(1): "allowable techniques for dealing with hostile double-crossing, forgetful, and mentally deficient witnesses leave no substance to a claim that one could not adequately develop his own witness at the former hearing. An even less

appealing argument is presented when failure to develop fully was the result of a deliberate choice."

**15.** Fed.R.Evid. 803(8)(C) provides in part:

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ...

(C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

1980). Exxon also argues that even if the ALJ's conclusions are findings of fact, the report is still inadmissible because "the sources of information or other circumstances indicate lack of trustworthiness" Fed.R.Evid. 803(8)(C). Paducah Towing relies upon our decisions in *United States v. School District of Ferndale Michigan,* 577 F.2d 1339 (6th Cir. 1978), and *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir. 1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979) and asserts that the findings here are indistinguishable from the findings admitted in those cases.

We believe that the ALJ's findings of fact are admissible as factual findings. In *United States v. School District of Ferndale, Michigan, supra,* this court concluded that the findings of an HEW examiner, which indicated that the school board had established separate schools for the purpose of operating a segregated school system, were admissible under Fed.R.Evid. 803(8)(C). In *Baker v. Elcona Homes, supra,* we concluded that whether the light was red or green for one driver or the other at the time of the accident is distinctly a factual finding." *Id.* at 559. As we noted in *Baker,* this circuit allows the admission of evaluative reports which contain inferences drawn from the evidence as factual findings under Rule 803(8)(C). *See Baker,* 588 F.2d at 557.

Here, the factual findings admitted into evidence were of two distinct types: findings regarding the events during the period before the accident and findings regarding the reasonableness of Duncan's actions. Clearly, the findings of historical fact, which are nothing more than conclusions regarding what happened when, are factual findings within the meaning of 803(8)(C). The findings in *Baker* and of the ALJ here, to the extent that they relate to historical fact, are indistinguishable. *See Baker,* 588 F.2d at 557–58.

Furthermore, the ALJ's findings regarding the reasonableness of Duncan's actions are factual within the meaning of Rule 803(8)(C). Although a finding that actions were reasonable is somewhat con-

clusory, we do not believe that such a label is controlling. *See Baker,* 588 F.2d at 557. In our view, a finding that amounts to an inference drawn from subsidiary findings is admissible under Rule 803(8)(C). *See Baker,* 588 F.2d at 557–58; *Ferndale,* 577 F.2d at 1354. A finding that actions were taken for the purpose of promoting segregation is essentially an inference drawn from historical facts; similarly, a finding that an action is reasonable is also an inference drawn from historical facts. Because we perceive no meaningful difference between the ALJ's findings of reasonableness and the findings of purposeful segregation admitted in *Ferndale,* we conclude that the ALJ's findings of reasonableness are factual findings excepted from the hearsay rule under 803(8)(C).

Although we believe the ALJ's findings are factual findings for the purposes of 803(8)(C), they are not admissible if they are based upon sources of information that are untrustworthy. *Baker,* 588 F.2d at 556–57. The trustworthiness of a factual finding is often a function of the trustworthiness of the information upon which the finding is based. *See Dallas & Mavis Forwarding Co. v. Stegall,* 659 F.2d 721, 722 (6th Cir. 1981); *United States v. 478.34 Acres of Land,* 578 F.2d 156, 156 (6th Cir. 1978). Four factors affect the trustworthiness of the sources of information: the timeliness of the investigation, the skill or experience of the public official, the type of hearing held, and possible motivation problems. *Baker,* 588 F.2d at 558 (quoting the Notes of Advisory Committee on Proposed Rules). This list of factors is not exclusive; any circumstance which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under this rule. *See, e.g. Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1125, 1146 (E.D.Pa.1980). Several courts have indicated that factual findings, which are based on inadmissible hearsay, are not admissible under Rule 803(8)(C) because the underlying information is un-

trustworthy. *E.g., Swietlowich v. County of Bucks,* 610 F.2d 1157, 1165 (3rd Cir. 1979) (district attorney's report excluded because based on hearsay); *John McShain Inc. v. Cessna Aircraft Co.,* 563 F.2d 632, 635–36 (3rd Cir. 1977) (National Transportation Safety Board report based on hearsay excluded); *Melville v. American Assurance Co.,* 443 F.Supp. 1064, 1115 n. 75 (E.D.Pa. 1977) *rev'd on other grounds* 584 F.2d 1306 (3rd Cir. 1978) (FAA airworthiness directive excluded because of reliance upon hearsay). *See generally,* Fed.R.Evid. 805.

The ALJ found that Duncan moored his tow in an ordinary and normal manner, and found that Duncan was not negligent in mooring his vessel as he did. The ALJ also found that Duncan did not fail to post an adequate watch. James Cole testified that the Endeavour was moored in a manner consistent with good seamanship and that the watch was safe and consistent with ordinary practice. The similarity between the ALJ's findings and Cole's testimony is striking. We have concluded that Cole's testimony is inadmissible hearsay and untrustworthy. We cannot determine, however, the degree to which the ALJ relied upon Cole's testimony. Several other expert witnesses testified at the administrative proceeding. The record, however, does not contain their testimony. Because the record does not contain the testimony of the other witnesses, we obviously cannot evaluate all the "sources of information" upon which the ALJ's findings of the fact are based. Cole's testimony is not sufficient to indicate that the sources of information are trustworthy. Because the burden of showing that the sources of information are untrustworthy is on the opponent of the evidence, *Baker,* 588 F.2d at 558, and because Exxon failed to produce transcripts of the testimony upon which the ALJ could reasonably have relied, we conclude that Exxon has failed to meet its burden of showing that the sources of information are untrust-

worthy. Consequently, we believe that the district court did not abuse its discretion in admitting the ALJ's factual findings into evidence.[16]

### III.

The district court, relying on the administrative law judge's decision and expert testimony, decided that the Endeavour was properly moored and that its crew acted reasonably both before and after the Tennessee departed. The district court concluded that "the sole substantial factor causing the accident was the negligent conduct of the Captain and crew of the Exxon-Tennessee in failing to exercise diligence to assure that the motion of the Exxon-Tennessee would not cause a surging by the Endeavour with the concomitant slack condition created in the shore cable." We reverse because we believe that the Endeavour's negligence was a factor in the accident.

The district court's findings of fact in an admiralty proceeding may not be set aside unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). Under this limited standard of review, we will reverse a decision if we are left with the firm conviction that the district court has made a mistake. *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Alexander v. Youngstown Board of Education,* 675 F.2d 787, 795 (6th Cir. 1982); *Johnson v. United States,* 600 F.2d 1218, 1222 (6th Cir. 1979). We must review the entire record and set aside a district court's finding of negligence if there is clear error in its decision. *See McAllister,* 348 U.S. at 20–21, 75 S.Ct. at 7–8; *Ingram Corp. v. Ohio River Co.,* 505 F.2d 1364, 1369 (6th Cir. 1974).

---

**16.** We note, however, that the unreliability of Cole's testimony, while not sufficient to warrant this court to conclude that the findings are inadmissible, does affect the weight to be accorded these findings. *E.g., United States v.*

*School District of Ferndale,* 577 F.2d 1339, 1355 (6th Cir. 1978) (circumstances which do not clearly indicate lack of trustworthiness may effect the weight given to the findings).

■ Although an appellate court will not overturn a district court's finding of negligence unless clearly erroneous, a court of appeals is not so restricted when it considers whether the district court properly defined the standard of care used to evaluate the conduct of the parties. That presents a question of law. In determining the proper standard of care, therefore, we may freely review the district court's conclusions.[17]

The district court failed to delineate the standard of care owed by the Endeavour's crew. Thus, we must initially determine, as a legal matter, the standard of care we will require of the crew before we can decide whether the district court clearly erred in finding that no breach of that standard occurred.

■ A tow boat moored on the shore of a river, serving as a tie-off for other barges, must be operated in a reasonable manner under the circumstances.[18] *Daigle v. Point Landing, Inc.,* 616 F.2d 825, 827 (5th Cir. 1980); *S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160, 165 (5th Cir. 1979). In order to comply with this legal standard, a vessel should not be placed in a situation where, if some foreseeable occurrence could easily disturb its mooring, nothing could be done to prevent the vessel from drifting downstream and causing damage.[19] The vessel must, therefore, be

**17.** The courts of appeals are divided on the issue of the proper scope of review of a finding of negligence. *Compare Mamiye Bros. v. Barber S.S. Lines, Inc.,* 360 F.2d 774, 776–778 (2nd Cir.), *cert. denied,* 385 U.S. 835, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966) ("a judge's determination on the issue of negligence does not fall within the 'unless clearly erroneous' rule") *and Swinney v. Keebler Co.,* 480 F.2d 573, 578 (4th Cir. 1973), *with Schenck v. Gov't of Guam,* 609 F.2d 387, 390 (9th Cir. 1979) ("a finding of negligence . . . is usually considered a question of fact and is . . . reviewable under the clearly erroneous standard") *and Grayson v. Cordial Shipping Co.,* 496 F.2d 710, 717 (7th Cir. 1974). In this circuit, a district court's finding of negligence may be set aside only if it is clearly erroneous. *E.g., Imperial Oil, Ltd. v. Drlik,* 234 F.2d 4 (6th Cir.), *cert. denied,* 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956). The standard of care to be required of a party, however, is a legal question; we may, therefore, freely review a district court's conclusion regarding the standard of care. *See, e.g., Miller v. United States,* 587 F.2d 991, 994 (9th Cir. 1978) ("[o]ur review of what standard of conduct should have been utilized in a negligence finding is a legal question"); *In re Flowers,* 526 F.2d 242, 244 (8th Cir. 1975) ("[t]he existence and definitions of the duties of the parties is an issue of law fully reviewable on appeal"); *Pacific Tow Boat Co. v. States Marine Corp. of Del.,* 276 F.2d 745, 752 (9th Cir. 1960).

**18.** In determining the precise duty of a vessel under the circumstances, a court must examine and weigh the probability of an accident, the potential extent of the injury, and the costs of adequate precautions.

Since there are occasions when every vessel will break from her moorings, and since, if she does, she becomes a menace to those about her; the owner's duty, as in other similar situations, to provide against result-ing injuries, is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions. *United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2nd Cir. 1947). In this particular case, the gravity of injury from a breakaway was great because of the proximity of the dam, the risk of becoming unmoored was significant because of the use of a single line for a tie-off tow, and the cost of adding additional lines was small. *See Ohio River Co. v. Continental Grain Co.,* 352 F.Supp. 505 (N.D.Ill.1972).

**19.** Paducah Towing contends that because nothing could be done to save it once it became unmoored, the Endeavor should be exculpated. This theory of inevitable injury, however, is inapplicable where, as here, the vessel's own negligence placed it in such a hazardous position.

(M)ost collisions are unavoidable at the moment they occur; . . . the primary rule is that precautions must be seasonable; and if they are not so, and a collision ensues in consequence of the delay, it is no valid defense to say that nothing could be done at the moment to prevent the injury; . . . it is generally possible to trace the cause of the disaster to some negligent act, or some antecedent omission of duty on the part of one of the vessels.

*The Adventuress,* 214 F. 834, 838–39 (D.Mass. 1914). *See In re Gypsum Carrier,* 465 F.Supp. 1050, 1062 (S.D.Ga.1979) ("(t)he *in extremis* doctrine does not apply 'where a vessel is placed in a position of danger through her own fault' and the fact that no corrective action would have avoided the collision after the emergency arose is irrelevant"); *Trawler Jeanne d'Arc,* 260 F.Supp. 124, 137 (D.Me. 1966); *United States v. S.S. Soya Atlantic,* 213 F.Supp. 7, 19 (D.Md.1963), *aff'd,* 330 F.2d 732 (4th Cir. 1964).

moored in a reasonably safe place in a reasonably safe manner. The requirements of reasonable care vary with the circumstances: the more hazardous the location of a moored vessel, the greater the precautions the crew must take in its mooring. *See Getty Oil (Eastern Operations), Inc. v. S.S. Ponce de Leon,* 409 F.Supp. 909, 918–920 (S.D.N.Y.1976), *aff'd,* 555 F.2d 328 (2nd Cir. 1977); note 18, *supra.*

Further, the crew of the Endeavour had the legal duty to be prepared to withstand the forces in the river which were reasonably foreseeable. As the master of a tie-off vessel in the self-help program, the captain of the Endeavour should have foreseen that the tow would be subject to swells from passing ships and barges which used it as a tie-off under the program. Since the Endeavour was to operate as a tie-off vessel under the program, the crew should have positioned and prepared it for ordinary swells from other vessels because "[o]nly unusual swells or suction which cannot be reasonably anticipated furnish the basis for a claim." *O'Donnell Transportation Co. v. M/V Maryland Trader,* 228 F.Supp. 903, 909 (S.D.N.Y.1963). *See The Favorita,* 43 F.2d 569, 570 (E.D.N.Y.1930) ("[t]he duty ... exists to avoid making up a tow in such a manner as to invite damage from ordinary and reasonably to be expected swells"); *Martin Marine Transp. Co. v. United States,* 66 F.Supp. 673, 676 (E.D.Pa.1946). A volunteer tie-off tow in the self-help program on the Ohio River acts as a temporary mooring point for cuts of barges passing through the nearby lock.[20] Any vessel acting as a tie-off must be prepared so that it would reasonably be expected to withstand the weight of additional barges and the close maneuvering of other vessels.[21] Under these circumstances, therefore, the Endeavour's crew had a legal duty to moor the vessel so that it would tolerate the activities and forces stemming from participation in the self-help program.[22]

**20.** The self-help program is voluntary in nature. The United States Army Corps. of Engineers' Special Notice to Navigation Interests No. 76–33 provides:

This program is voluntary on the part of navigation interests and its sole purpose is to arrange for "self-help" by the industry to reduce delay time at these locks. The lockmaster or his representative shall advise of the need for voluntary action by radio as provided herein, but this advice shall not be considered an order or a direction for action within the authority of the lockmaster under 33 CFR 207–300, and no Captain, Pilot or other responsible officer in charge of a vessel is obligated to respond, except as a volunteer. The only consequence attending a refusal to volunteer will be delays in lockage. The United States assumes no liability for the transmission of such advice and shall not be responsible for any consequences of this volunteer action.

**21.** Paducah Towing argues that where a moored vessel is damaged by a vessel in motion, a presumption arises that the moving vessel was at fault. *See, e.g., The Rotherfield,* 123 F. 460, 461 (S.D.Ala.1903). The rule is not applicable, however, unless the stationary vessel was initially moored properly.

However, before this rule of law (that the moving vessel is presumptively at fault) is applicable, it must be shown that the vessel was properly moored; and accordingly, the question is posed in the instant case as to whether or not the barge Darien was properly moored ... Just as a duty exists on a moving ship not to throw damaging swells under the circumstances, so does a duty exist on a ship to be seaworthy and moored in such a manner that a situation will not be created whereby the ordinary and reasonable swells created by a passing ship in such a locale will result in damage to the moored ship. The moving ship is not an insurer, and is not liable for all damages that occur as a result of its swells. The evidence ... did not show the Darien was properly moored and hence the above rule of law is inapplicable. *Martin Marine Transportation Co. v. United States,* 66 F.Supp. 673, 676 (E.D.Pa.1946) (citations omitted).

**22.** When the Endeavour volunteered as a tie-off tow for the self-help program, *see* note 20, *supra,* it should have anticipated that additional barges would be temporarily moored to it and that vessel would maneuver nearby. The Endeavour should have prepared for these foreseeable exigencies. *Cf. The City of New York,* 54 F. 181, 185 (2nd Cir. 1893) ("the case is one where a vessel, having agreed to do a particular duty, and familiar with all its ordinary incidents, thrust herself unnecessarily into a position where she was injured by just such a risk as she should have anticipated"); *Dunion v. Kaiser,* 124 F.Supp. 41, 45 (E.D.Pa.1954) (in entering a racing event, a vessel should know that "it would encounter high speed maneuvers

█ In light of our determination of the standard of care the Endeavour's crew owed, we believe that the district court clearly erred in its conclusion that the crew had not breached its duty of care. Because of the admixture of three dangerous conditions—the crew's hazardous placement of the Endeavour where it could not be saved from damage should it become free, the crew's failure to take sufficient precautions in mooring the Endeavour as a tie-off vessel in the self-help program, and the crew's inadequate preparation for the risks of becoming unmoored—the Endeavour was, at least in part, responsible for the accident.

█ Because of the Endeavour's proximity to the dam and the strength of the river's current, the district court indicated that even if Duncan had been in the wheelhouse at the time the Endeavour had become unmoored, the accident could not have been prevented. The Endeavour was thus placed in a precarious position where a vessel might have to react to the emergency conditions of being adrift. With vessels passing on the river and other tows tying off, the Endeavour would also be susceptible to surge and suction. *See The Jim and Bill,* 4 F.Supp. 258 (E.D.N.Y.1933) (where a single line is used, a vessel moves up and down in the river, placing additional strain on the mooring). A dangerous location would lead a reasonably prudent crew to conclude that it must use an exceptionally stable mooring or that it must have its engines ready to run. Thus, the Endeavour was moored in a hazardous position which required either a firm mooring or readiness should a tenuous mooring become undone.

█ A tie-off should use several lines for mooring to avoid the risks of swells causing slack and the attendant danger of becoming unmoored. "[M]ooring lines must be sufficient in both number and placement and carefully checked in order to prevent or minimize the suction effect of passing vessels." *Creole Shipping, Ltd. v. Diamandis Pateras, Ltd.,* 410 F.Supp. 313, 317 (S.D.Ala.1976), *aff'd,* 554 F.2d 1348 (5th Cir. 1977). (per curiam). A properly moored tug and barge acting as a tie-off should be prepared to withstand swells without shifting positions, by using, as a minimum precaution, both a breast line and spring lines.[23] *See id.* at 317, 319. The courts have consistently held that in order to fulfill its duty of ordinary care where swells are foreseeable, a moored vessel must use several lines to provide stability:

> It is quite apparent that the ship's moorings aft were improper ... However, instead of putting a breast line directly to the dolphin or some other mooring device and using spring lines aft as they did forward, a short cut was used and just the one line was fastened to the dolphin on the north end of the wharf and that line was really neither a true spring line nor a breast line. As used it was meant to act as both. But wasn't this a make-shift and putting too much trust in one line where two or three could have and should have been used?

*City Compress & Warehouse Co. v. United States,* 190 F.2d 699, 702 (4th Cir. 1951). *See Ohio River Co. v. Continental Grain Co.,* 352 F.Supp. 505, 508–09 (N.D.Ill.1972) (the vessel "should have taken all precautions to see that the barges were moored securely and such precautions would have indicated the use of breast and lead lines ... in order to prevent surges in either direction"); *Sewerage & Water Board v. The Joe E. Hill,* 118 F.Supp. 951, 953 (E.D.La.1954), *aff'd,* 218 F.2d 881 (5th Cir. 1955); *Gulf Oil Co. v. United States,* 98 F.Supp. 988, 990 (S.D.N.Y.1951). In summation, the reasonably prudent crew would moor a vessel with several lines to minimize the risk of slack.

in close proximity to other craft operating in rough and confused water (and) must be left to bear the loss which has resulted").

**23.** A breast line is tied from the center of a moored ship to the shore. A lead, or spring, line is tied from the bow or stern of a moored ship directly ahead or behind the vessel, respectively; they are used to minimize fore and aft movement and to prevent surges. *See Creole Shipping, Ltd. v. Diamandis Pateras, Ltd.,* 410 F.Supp. 313, 317 (S.D.Ala.1976); *Ohio River Co. v. Continental Grain Co.,* 352 F.Supp. 505, 508–509 (N.D.Ill.1972).

This precaution is particularly important when a vessel acts as a voluntary tie-off and positions itself close upstream from a dam so that the potential damage from becoming unmoored is significant.[24]

Furthermore, the cursory inspection of the shore line heightened the risks resulting from the use of an insufficient number of lines. Because the self-help program would subject a tie-off tow to the strain of the mooring of additional barges and the close passing of other vessels, a tie-off has a duty to inspect its mooring carefully.[25] *See notes* 20–22 and accompanying text, *supra. Cf. Osterhoudt v. Federal Sugar Refining Co.,* 22 F.2d 475, 476 (2nd Cir. 1927) ("[w]hen a barge moors alongside a pier, she is bound to put out no more lines than are necessary for her own weight ... [h]owever, the inside barge may be acquiescent accept the situation, and, if so, she shares the fault"). The evidence showed that the Endeavour's crew examined the single steel cable, approximately 100 to 125 feet in length, mooring the construction barge with a pair of binoculars from the wheelhouse and the deck of the barge. Such a limited examination of the quality of the cable and the nature of the mooring to the tree was insufficient to meet the standard of care owed by the crew of the Endeavour, especially given the hazardous location and the likelihood that it would be subjected to unusual strain because of the Endeavour's service as a voluntary tie-off. In light of these circumstances, we believe that the district court clearly erred in its conclusion that the inspection of the shore line was adequate.[26]

The Endeavour placed itself in a hazardous location, inadequately moored with a single line, and then turned off its engines so that it could not respond immediately. In so doing, the Endeavour negligently failed to anticipate and guard and to provide adequate moorings. *Cf. Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.,* 521 F.2d 229 (5th Cir. 1975) (duty of a wharfinger); *Norfolk Tidewater Terminals v. Wood Towing, Inc.,* 94 F.2d 164 (4th Cir. 1938) (same).

24. Paducah Towing argues that because the mooring lasted several hours, it must have been sufficient. This showing, however, does not demonstrate that the mooring was reasonable for the foreseeable strain from swells over a period of time as the Endeavour performed the functions of a tie-off tow. *See The Jim and Bill,* 4 F.Supp. 258 (E.D.N.Y.1933).

25. Paducah Towing asserts that because the Tennessee was the last vessel to arrive at the tie-off point, it had the duty to inspect the shore line and provide any additional moorings. *See Federal Barge Lines, Inc. v. Republic Marine, Inc.,* 472 F.Supp. 371, 373 (E.D.Mo.1979), *aff'd,* 616 F.2d 372 (8th Cir. 1980); *In re Mary T. Tracy,* 92 F.Supp. 706, 708–09 (S.D.N.Y. 1950), *aff'd,* 194 F.2d 362 (2nd Cir. 1952) We believe, however, that under the special circumstances of the self-help program, the tie-off tow had a legal duty to prepare its mooring for the foreseeable strain of additional temporary moorings. *See* note 22 and accompanying text, *supra.* Placing the duties of inspection and provision of adequate shore moorings on the locking vessel ignores the purpose of the self-help program. The program is designed to expedite lockage and avoid delay. *See* notes 3 & 22 and accompanying text, *supra.* To make the locking vessel, which does not tie-off its first cut and which is only temporarily in contact with the tie-off tow, inspect and prepare the shore moorings would defeat the very purpose of the self-help program by introducing additional delays. Furthermore, the tie-off tow is in a position to anticipate the pressure from the temporary mooring of additional barges

26. Under the hazardous conditions in which the Endeavour placed herself, the crews should have carefully inspected the cable and its mooring.

> [T]he flotilla of seven barges broke loose from the bulkhead at 34th Street and the East River because of the extra strain which the addition of the Jackson to the tier of six boats put upon the lines of the inmost barge, the Eureka No. 29, causing the lines to part. The master of the Mary T. Tracy was negligent in not directing the deckhand of the tug to examine the lines by which the Eureka No. 29 was moored to the bulkhead. The deckhand did not go beyond the coal barge out from the bulkhead. If he looked at the lines of the Eureka No. 29, which were black from use, it was from a point about 70 to 80 feet off. He could not properly examine the lines from that distance, even though there were floodlights on the wharf for the unloading of the Eureka No. 29. The deckhand of the Mary T. Tracy was negligent in his examination of the lines.

*In re Mary T. Tracy,* 92 F.Supp. 706, 708 (S.D. N.Y.1950). *See* note 25 and accompanying text, *supra.*

against foreseeable dangers. Normally, of course, a captain may reasonably decide to turn off his engines after he has securely moored his vessel. When a vessel is placed in a dangerous position, especially where tenuous moorings are used and close maneuvering from tie-offs is likely, it should have an engine ready so that it is prepared to avoid loss or damage:[27]

> "The engines of the vessel should have been placed on "Standby" to provide with instantaneous maneuvering power in the event of an emergency ... It should be noted that the instant case does not reflect the "customary" situation of a ship at anchor. Although the vessel might have been justified because of weather and traffic conditions in anchoring where she did, this does not alter the fact that it elected to anchor in a dangerous locale. It was incumbent that the vessel take precautions which were suitable to the abnormally hazardous circumstances of her place of anchorage."

*Getty Oil Co. v. S.S. Ponce de Leon,* 409 F.Supp. 909, 919 (S.D.N.Y.1976), *aff'd,* 555 F.2d 328 (2nd Cir. 1977). The Endeavour was in a hazardous position—if it became unmoored from its single line, nothing could prevent it from going over the dam—and it should have kept an engine idling so that it could effectively respond to the risk of becoming adrift.

■ Paducah Towing argues that tug boats regularly turn off their engines when moored. It contends that the industry practice is to shut off engines in order to conserve fuel and prevent the build-up of carbon deposits. *See* note 27 and accompanying text, *supra.* The accepted practice in an industry, however, is not a conclusive

measure of reasonableness. A generally accepted industrial practice may still be negligence. "An industry's customary practices are not necessarily determinative of reasonableness." *Tucker v. Calmar Steamship Corp.,* 457 F.2d 440, 446 (4th Cir. 1972). *See In re M & J Tracy, Inc.,* 422 F.2d 929, 932 (3rd Cir. 1969) ("the fact that a process seems to have been one generally used ... does not sanctify it"); *Venable v. A/S Det. Forende Dampskibsselskab,* 399 F.2d 347, 353 (4th Cir. 1968). Even if vessels regularly moor with a single line close upstream from a dam without an engine idling so that an accident is unavoidable should the vessel become unmoored, we believe that such conduct, especially by a tie-off tow in the self-help program, is unreasonable. A generally accepted industrial practice will not shield a vessel from liability where the risks of injury are so substantial and foreseeable. *See* Note 17–18 and accompanying text, *supra.*

■ Because we find that the district court erred in its findings that the Endeavour was not negligent, this case must be remanded so that the district court may allocate liability between the parties. Damages in admiralty cases must be divided in proportion to the respective fault of the parties: "when two or more parties have contributed by their fault to cause property damage in a maritime collision ... liability ... is to be allocated among the parties proportionally to the comparative degree of their fault." *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). The Endeavour must pay damages in proportion to the extent that it was at fault for the accident.[28] *Gele v. Wilson,* 616 F.2d 146,

---

**27.** Of course, under safe circumstances, a vessel may moor and turn off its engines to conserve fuel and prevent damage; such action may be reasonable and prudent. *See the Charles Hubbard,* 229 F. 352 (6th Cir. 1916). The Endeavour, however, was tenuously moored in a hazardous location. Under such circumstances, ordinary care would require that it be prepared to avoid an accident if it became unmoored. *See Getty Oil (Eastern Operations), Inc. v. SS Ponce de Leon,* 409 F.Supp. at 919. The Endeavour could have kept one engine idling and alternated the engines to avoid carbon build-up.

**28.** *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), holds that a comparative negligence rule, which apportions damages in accordance with the parties' respective degrees of fault, supplants the divided damages rule, which required an equal division of damages where both parties had been at fault, regardless of their relative degrees of fault, for a maritime

148 (5th Cir. 1980). Fault, rather than causation, is the measure of comparative negligence.[29]

A vessel acting as a tie-off tow in the self-help program has the legal duty to moor itself in a fashion which would reasonably be expected to withstand the forces resulting from its participation in the program. We believe that the confluence of three dangerous actions—placing the vessel in a precarious and hazardous location, mooring it in a tenuous fashion, and failing to prepare for the consequences of becoming unmoored—makes the district court's decision completely to exonerate the Endeavour clearly erroneous in light of the standard of care required of the Endeavour's crew. Because we believe that the Endeavour must bear at least some responsibility for the accident, we reverse the district court's order and remand this case for further proceedings consistent with the principles stated in this opinion.

Reversed and Remanded.

accident. We believe that *Reliable Transfer* also abrogates the major-minor rule, which exonerates a "minor" wrongdoer and places complete liability with a "major" wrongdoer. The district court must apportion liability even if one vessel is primarily responsible and another is only slightly negligent. *Getty Oil (Eastern Operations), Inc. v. SS Ponce de Leon,* 555 F.2d 328, 332–33 (2nd Cir. 1977).

**29.** The claimants assert that because they are innocent and Exxon and Paducah Towing are concurrent tortfeasors, the claimants should be permitted to collect the full amount of their damages from either party. *See Edmonds v.*

*Compagnie Generale Transatlantique,* 443 U.S. 256, 271 n. 30, 99 S.Ct. 2753, 2762 n. 30, 61 L.Ed.2d 521 (1979); *The Ship Sterling,* 106 U.S. 647, 1 S.Ct. 89, 27 L.Ed. 98 (1883). Exxon, relying on *dicta* in *Edmonds,* contends that since both parties are before the district court, the claimants must wait until liability is properly apportioned by the district court. *Edmonds,* 443 U.S. at 271 n. 30, 99 S.Ct. at 2762 n. 30. Because we are remanding this case to determine the respective responsibilities of the parties and the district court may decide that Exxon was not at fault, we need not reach this question.